**RICHARD M. ROGERS, #045843**
**LAW OFFICE OF RICHARD M. ROGERS**
100 Bush Street, #1980
San Francisco, CA 94104
Telephone: 415/981-9788
Facsimile: 415/981-9798
Email: RogersRMR@yahoo.com

Attorneys for Plaintiff
**BARBARA JELIN**

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| BARBARA JELIN,<br><br>Plaintiff,<br><br>v.<br><br>SAN RAMON VALLEY UNIFIED SCHOOL DISTRICT,<br><br>Defendant. | **Case No.: C16-5986 EDL**<br><br>Case filed: 10/17/16<br>Trial date: 12/10/18<br><br>**PLAINTIFF'S MOTION IN LIMINE NO. 1: TO PRECLUDE DEFENDANT'S EXPERT WITNESS FROM TESTIFYING**<br><br>Pretrial Conf: 10/30/18<br>Time: 2:00pm<br>Location: Courtroom E, 15th Floor |

# I. MOTION

Plaintiff moves the Court to bar Defendant's expert witness from testifying in this case on the grounds that her testimony is inadmissible and/or irrelevant.

# II. ARGUMENT

## A. The Witness

Defendant disclosed one expert, Rhoma Young (Exhibit 1 hereto). Ms. Young is an HR Consultant. (P. 26 of Jelin Report, Exhibit 1 hereto) She has an MA in Administration and Management. She has a Certificate in Counseling and Psychology and a Certificate in Conducting Workplace Investigations. (P. 29 of Jelin Report, Exhibit 1 hereto) She has never interviewed Ms. Jelin. Ms. Young has reviewed the medical reports, the depositions, and interviewed one witness. There are no psychology reports. There is no psychological testing.

Ms. Young's 23 page Report consists of her views of the evidence (cherry-picked and highlighted), her opinions on Ms. Jelin's character and credibility, and an opinion that the failure of the interactive process was Ms. Jelin's fault. Virtually all of Ms. Young's testimony should be excluded as prejudicial. Rule 403.

## B. Legal Standards

It is the jury's function to draw whatever conclusions are to be deduced from the evidence. Expert opinion testimony is inadmissible if it will not help the trier of fact to understand the evidence or to determine a fact in the case. Fed. Rules of Evid. 702(a). Expert opinions must be based on scientific, technical, or other specialized knowledge. Rule 702(a). The testimony must be based on sufficient facts or data. Rule 702(b). The testimony must be the product of reliable principles and methods. Rule 702(c) And the expert must have reliably applied the principles and methods to the facts of the case. Rule 702(d). The probative value of the testimony must substantially outweigh its prejudicial effect. The Court, in its discretion, may properly exclude expert opinion testimony where the facts are capable of being understood and evaluated by the jury without the aid of an expert. *Wilson v. Muckala*, 303 F.3d 1207, 1219 (10th Cir. 2002); *Kotla v. Regents of the Univ. of California*, 115 Cal.App.4th 283, 291-294 (2004).

//

## C.     The Report

Ms. Young gives her opinions on Ms. Jelin's medical history and credibility at Pages 2-4. Ms. Young is not qualified to offer these opinions, and the factfinder can evaluate these facts without her guidance.  The summary and opinions are prejudicial and should be excluded on that ground also.  Rules 403, 702.

Ms. Young's unqualified opinion on these issues is not only unhelpful, but risks unfair prejudice to Plaintiff, confusion of the issues, and misleading the factfinder.  *U.S. v. Gonzalez-Maldonado* (1st Cir. 1997) 115. F.3d 9, 15.  Expert testimony that does nothing but attack a witnesses' credibility encroaches upon the factfinder's exclusive function to make credibility determinations; therefore, it does not help the trier of fact as required by Rule 702. *U.S. v. Charley* (10th Cir. 1999) 189 F.3d 1251, 1267; *Nimely v. City of New York* (2nd Cir. 2005) 414 F.3d 381, 398; see, *U.S. v. Sine* (9th Cir. 2007) 493 F.3d 1021, 1040.

Ms. Young gives her opinions on Defendant's policies and practices at Pages 4-6.  These opinions are irrelevant and prejudicial.  The issue in this case is whether Defendant reasonably accommodated Ms. Jelin.  This is a unique constellation of facts.  Ms. Young's opinions on generalized policies and practices are not helpful.  Her implicit opinions that Ms. Jelin is unhelpful, untruthful, and illogical are not based on specialized knowledge and are highly prejudicial. There is no showing, nor can there be, that specialized knowledge informed these opinions.  *Sine, supra*.

Ms. Young's review of the medical history, at Pages 6-9, is not within her expertise and is not helpful to the factfinder's understanding.   It is actually detrimental to the factfinder's understanding since she is undermining the medical expert and questioning Ms. Jelin's credibility with her prejudicial commentary on facts and medical reports.

Ms. Young's discussion of the interactive process, starting at Page 9, combines her legal opinions with cherry-picked deposition excerpts for the purpose of attacking Ms. Jelin's credibility; it should be excluded.  *U.S. v. Sine, supra*.  The opinions Ms. Young expresses are not expert opinions; there is no specialized knowledge informing them.  The factfinder can understand and evaluate the interactive process in this case.  Ms. Young's legal opinions are inadmissible. *RLJCS Enterprises, Inc. v. Prof. Benefit Trust, Etc.* (7th Cir. 2007) 487 F.3d 494, 498.

Ms. Young's discussion of undue hardship, at Pages 12-13, is pure legal opinion and unsupported, irrelevant speculation on a non-issue. Defendant has never claimed undue hardship. Ms. Young proposes to instruct the jury on what they should consider under applicable law.

The same objections apply to Ms. Young's discussion of "a qualified person with a disability." (Page 13) Ms. Young is not qualified on this subject.

In Ms. Young's discussion of Accommodation, Pages 13-19, she cherry-picks deposition excerpts to support her legal opinion that Ms. Jelin was accommodated (Page 14) and her actual determination that Ms. Jelin was responsible for the failure to accommodate, Page 15. The issue of responsibility for the failure to accommodate is an ultimate issue in the case, and it is a factual issue well within the capability of the factfinder to evaluate and determine without technical or specialized assistance. Ms. Young's testimony is inappropriate. *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993) 509 U.S. 579, 591; *Kumho Tire Company, Ltd. v. Carmichael* (1999) 526 U.S. 137, 156; *Lauzon v. Senco Products, Inc.* (8th Cir. 2001) 270 F.3d 681, 686. Ms. Young's discussion of the technology (Pages 15-17) is not within her expertise. It is there solely to defame Ms. Jelin and question her credibility. It should be excluded. *Sine, supra*.; Rule 473.

Ms. Young's discussion of Performance Management (Pages 19-22) is, again, cherry-picking evidence to undermine Ms. Jelin's credibility by emphasizing negative statements in performance evaluations and depositions.[1] The factfinder is capable of evaluating this evidence without expert opinion.

Ms. Young's Conclusion (Pages 22-23) does not contain opinions based on her expertise with the possible exception of the first and second sentences of the final paragraph. Otherwise, she appears to be quoting Mr. Rogenski and commenting on the medical evidence. The first and second sentences of the final paragraph are not helpful to the factfinder.

The issues of reasonableness and accommodation history are capable of being evaluated and understood by the factfinder without the aid of an expert. Plaintiff has never asserted that the

---

1 Much of the deposition testimony throughout is hearsay and/or lacks foundation. Plaintiff assumes Defendant intends to introduce testimony to lay a proper foundation.


frequency of meetings was inconsistent with suggested management practices. The issue is why the meetings were ineffective.

Ms. Young has put together a final argument based on selected evidence. This is not expert testimony. Ms. Young's report is filled with suggestions that Ms. Jelin is "strange," unreliable, lacking credibility, and impossible to please. That is character assassination, not expert testimony, at least insofar as Ms. Young is concerned. She is not a psychologist; she has not interviewed nor tested Ms. Jelin.

## D. Conclusion

Ms. Young should not be permitted to testify.

Respectfully submitted,

Dated: 10/08/18

LAW OFFICE OF RICHARD M. ROGERS

By: [signature]
RICHARD M. ROGERS
Attorneys for Plaintiff

EXHIBIT 1

*Jelin v San Ramon Valley Unified School District*
Case No.: C16-5986 EDL
PLAINTIFF'S MOTION IN LIMINE TO PRECLUDE DEFENDANT'S EXPERT WITNESS
FROM TESTIFYING

KEITH R. SCHIRMER, Esq. (087691)
JAMES HUAN LY, Esq. (289912)
EDRINGTON, SCHIRMER & MURPHY LLP
2300 Contra Costa Boulevard, Suite 450
Pleasant Hill, CA 94523-3936
Telephone: (925) 827-3300
Facsimile: (925) 827-3320
Email: kschirmer@esmlawfirm.com
jly@esmlawfirm.com
Attorneys for Defendant
SAN RAMON VALLEY UNIFIED SCHOOL DISTRICT

IN THE UNITED STATE DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

BARBARA JELIN,

Plaintiff,

v.

SAN RAMON VALLEY UNIFIED SCHOOL DISTRICT,

Defendant.

/

CASE NO. C16-5986 EDL

DEFENDANT SAN RAMON VALLEY UNIFIED SCHOOL DISTRICT'S DISCLOSURE OF EXPERT WITNESS, EXPERT WITNESS INFORMATION, AND EXPERT WITNESS REPORT

Defendant SAN RAMON VALLEY UNIFIED SCHOOL DISTRICT (hereafter the "District") hereby submits this Disclosure of Expert Witnesses, Expert Witness Information, and Expert Witness Report.

## I. DISCLOSURE OF RETAINED EXPERT WITNESSES

1. Rhoma Young
   5690 Chelton Drive
   Oakland, CA 94611
   510-530-6746

DATED: July 16, 2018

EDRINGTON, SCHIRMER & MURPHY, LLP

Keith R. Schirmer, Esq.
James Huan Ly, Esq.
Counsel for Defendant SAN RAMON VALLEY UNIFIED SCHOOL DISTRICT

EXHIBIT 1

KEITH R. SCHIRMER, Esq. (087691)
JAMES HUAN LY, Esq. (289912)
EDRINGTON, SCHIRMER & MURPHY LLP
2300 Contra Costa Boulevard, Suite 450
Pleasant Hill, CA 94523-3936
Telephone: (925) 827-3300
Facsimile: (925) 827-3320
Email: kschirmer@esmlawfirm.com
jly@esmlawfirm.com
Attorneys for Defendant
SAN RAMON VALLEY UNIFIED SCHOOL DISTRICT

IN THE UNITED STATE DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

BARBARA JELIN,

Plaintiff,

v.

SAN RAMON VALLEY UNIFIED SCHOOL DISTRICT,

Defendant.

CASE NO. C16-5986 EDL

DEFENDANT SAN RAMON VALLEY UNIFIED SCHOOL DISTRICT'S EXPERT WITNESS DECLARATION

I, James Huan Ly, declare:

1. That I am an attorney licensed to practice law before all courts in the State of California, and am an associate with the law offices of Edrington, Schirmer & Murphy and am one of the attorneys of record in the above-entitled matter on behalf of Defendant SAN RAMON VALLEY UNIFIED SCHOOL DISTRICT (hereafter the "District"). If called as a witness, I could and would competently testify thereto.

2. Rhoma Young is a human resources consultant and is expected to testify regarding the policies/practices of the District, with special focus on the interactive process and accommodation options, leave of absence policies and implementation, communications to discuss accommodation considerations and return to work (potential RTW) issues dealing with potential disability issues of School Psychologist Barbara Jelin, the District's policies and

practices on performance management. Ms. Young's report is enclosed as Exhibit A.

3. Ms. Young has agreed to testify at trial.

4. The curriculum vitae of Ms. Young is attached as Exhibit 2 of her report, which is herein enclosed as Exhibit A.

5. The Federal Rule of Civil Procedure 26 case list identifying cases in which Ms. Young has testified as an expert at trial or deposition in the previous 4 years is attached as Exhibit 3 of her report, which is herein enclosed as Exhibit A.

6. Ms. Young is sufficiently familiar with the pending action to submit to a meaningful oral deposition concerning the testimony described above including her expert opinions and the basis therefore.

7. Ms. Young charges $595.00 per hour for expert witness testimony, as stated in page 25 of her report.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, is within my personal knowledge, and if called as a witness I am competent to testify thereto.

Executed on July 16, 2018, at Pleasant Hill, California.

JAMES HUAN LY

Jelin report

To: James Ly

From: Rhoma Young
HR Expert Witness Report
June, 2018

I have extensive background in dealing with and offering expert witness testimony in situations and cases involving employee disability and health conditions, and have testified in court over 100 times.  Such situations usually involve discussions and conversations exploring a variety of possible accommodation options to allow an individual to effectively continue to be employed in their workplace, with or without accommodation.  That process is often referred to as an interactive process.  My full background relevant to this case is outlined in Exhibit 1 to this report.  My CV is attached as Exhibit 2.  A rule 26 case list enumerating the cases in which I have testified or been deposed in the last 4 years is attached as Exhibit 3.

Scope

In looking at a policy, then subsequent practices used in the policy implementation, several key areas share a common thread that is useful in establishing a framework to examine and evaluate the effectiveness of the implementation of EEO, accommodation, interactive process and ways to prevent discrimination, harassment and retaliation in implementing those policies and practices. In this case, I was asked to look at the policies/practices of San Ramon Valley Unified School District (SRVUSD), with special focus on the interactive process and accommodation options, LOA policies and implementation, communications to discuss accommodation considerations and return to work (potential RTW) issues dealing with potential disability issues of School Psychologist Barbara Jelin (BJ).  I was also asked to review the District's policies and practices on performance management.  Exhibit 4 outlines the information I reviewed during this case to help provide the background for the opinions and analysis in this report.

Are SRVUSD's policies and practices consistent with the suggested management practices (HR basics) or the efforts that you would expect a reasonable employer to take in complying with relevant laws and regulations, managing employee attendance / performance, dealing with potential disability/accommodation areas, employee behavior and in dealing with and preventing discrimination, harassment and retaliation in the workplace?
- Were SRVUSD's actual practices (and implementation) reasonable, effective and consistent with their own policies?

I am not looking for perfection, nor am I hoping for "best practices". I am looking at whether the policies and practices were appropriate and reasonable.  As I am not an attorney, I will not be offering legal opinions nor will I testify as to the ultimate facts.

SRVUSD has detailed policies/practices covering an array of topics that are at question in this case. Policy language is comprehensive and detailed. The complaint procedure is clear and encourages problem resolution. If an employee feels they have been discriminated against, treated unfairly, bullied or retaliated against there are procedures to address that. Policies are written in a way that is consistent with suggested management practices (SMP).

Ms. Jelin has used District and external agency complaint procedures in voicing her disagreement and complaints. The timespan of her health issues is extensive, dating back to the 1990's, which predate her employment in the District. Differing from some of the medical information, she reported her physical problems have been continuous/escalating over the last several years. However, current SRVUSD policies on

- ✓ EEO,
- ✓ non- discrimination in employment,
- ✓ professional standards,
- ✓ non-discrimination,
- ✓ harassment and bullying,
- ✓ employee use of technology,
- ✓ ways to address industrial accidents, various LOAs,
- ✓ ergonomics and
- ✓ uniform complaint procedure

also highlight the unique characteristics of SRVUSD. They provide a context for the employment and performance of Ms. Jelin and the approaches of SRVUSD's staff and management to find ways to assist her to continue her employment with the district.

I reviewed extensive material in this case, including depositions, deposition exhibits, information from the school district, e-mails, correspondence, meeting summaries and technology support information. A full list of the material reviewed in this case is attached as Exhibit 4. For the overall District approach to dealing with the accommodation process, interactive process and the particulars dealing with Ms. Jelin, I also interviewed Keith Rogenski, the Assistant Superintendent, with Human Resource responsibility. Notes from that interview are attached as Exhibit 5. Excerpts from the deposition of the president of the Union representing Ms. Jelin, Ms. Katzburg are attached as Exhibit 6. Should additional information become available that would change or modify my opinions, I may submit an addendum to this report.

***Case Background***

Ms. Jelin is a psychologist at the San Ramon Valley Unified School District, and has worked there since 2006. She seems to have encountered physical problems, not only since she has been there, but even previously.

In a review of the medical records, it indicates that she has musculoskeletal problems that go back into the early 1990s (before she began to work at the District). Her medical file indicates that physicians have quoted other, earlier independent medical reports that

state, "An AME on June 10, 1998 related to her left shoulder pain with radiation to both arms and the right elbow, also low back pain and left shin pain."

This information indicates that Ms. Jelin had chronic musculoskeletal problems since her teenage years.  Also included is a statement that says "It is apparent that this woman has a tremendous psychological overlay" (mentioned in a Stanford report).

Her medical history goes back a long time with records that date back to July 10, 1990. One medical report indicates that she had right elbow surgery with ulnar nerve transpositional performed on August 14, 1995. She was seen at Stanford University for pain management.

Since she has been at the District, health issues appear to be the *continuation rather than the beginning* of a long series of complaints about her body. There have been treatments. She has submitted an ongoing series of work status reports from treating physician Dr. Lin, that she is variously "partially or totally disabled".   There have been frequent doctor visits. There have been various medical organizations involved, and there have been multiple surgeries. There has been physical therapy.

In 2010, a QME Re-Evaluation says that Ms. Jelin, in a medical interview with the doctor talked about a history of current problems but *denied* a history of any problems with her elbows, upper arms, shoulder, low back, headaches, and multiple other problems that were listed in other medical reports about her pain in her leg, hip and arm. She stated (during that exam), that while off work she likes to really stay active.

A Medical QME Report from 2010 also cites that this report "is a result of a very thorough and complete physical examination and tests".  She *denied* a history and current problems with her elbows, upper arms, shoulders, low back, headaches and hip and leg pain. She stated that while off work, she likes to *walk, bicycle, surf, snorkel, scuba, hike and participate in triathlons*. It is noted that that description is how *she describes* her *current activity* regimen at the time of the evaluation (in 2010).

These two *dramatically different portrayals of Ms. Jelin's health* almost outline the *dichotomy* that seems present itself in what she *currently* experiences and what medical providers report. There has been a long history of medical treatment.

Since she has been employed at SRVUSD, there has been a long history of accommodations including technical help and support both in hardware and software, specialized equipment and dealing with work schedules and assignments.  This forms a work environment and pace that usually allows her to safely and effectively be able to complete the essential functions of her job.

However, there has also been a series of complaints that Ms. Jelin has alleged since she joined the organization. She complains and feels that she is now being discriminated against and harassed by the staff engaged in the interactive process.

It is this dichotomy that forms the basis for her claims of discrimination and questions about the efficacy of any aspirational or future accommodation (s).

***Opinion***

It is my opinion that SRVUSD's policies and practices are consistent with usual industry practices and HR management basics in addressing equity in employment, problem solving, performance and attendance. It is my opinion that SRVUSD implements and maintains the necessary record keeping to achieve balance and consistency in:

- problem resolution,
- adequate communication in a back and forth process between the employee and employer and
- accountability through progressive discipline/corrective action practices,

in fostering equal employment and preventing and responding to concerns of discrimination, harassment and retaliation. Documentation and discussions of accommodation efforts and attempts and performance progress are balanced and detailed. While Ms. Jelin has one view, an entire staff from the District has been working with Ms. Jelin for years to try "and make things work". She disagrees with their efforts and effectiveness in providing adequate accommodations so she can safely and effectively perform her job.

Technology support has been consistent and ongoing. LOA administration and tracking appeared to be thorough and administration professionally implemented. It is my opinion that SRVUSD's response to various questions/comments/LOA requests, her ongoing concerns and accommodation requests of Ms. Jelin about the circumstances surrounding her work, workplace issues and accommodation options were taken seriously by SRVUSD. She asked for time away for various health and accommodation issues. She received it.

She made frequent requests and demands for various equipment, software and time away from work. The organization responded when they had a number of various District and technical staff attempt problem resolution over several years.

The situation with Ms. Jelin's health was not a constant. Her medical information indicates physical problems started way before she began her work with the District. It seemingly was exacerbated by continuing "injuries" that periodically occurred, further complicating the situation and expanding, and changing the medical restrictions for which Ms. Jelin wanted accommodation. She has presented most of her health issues as being work related and covered by Workers' Comp protections. However, her last three health instances (of walking into a door frame, hyperextending her thumb on a cord when lifting and standing in front of a door to block a 10 year old child attempting to exit) are unusual and could pose a question of her ability to operate safely in the workplace.

The Collective Bargaining Agreement (CBA) outlines a path of corrective action about holding staff accountable for their performance.  Ms. Jelin is subject to that and protected by a specific outline of how evaluations must be done if there are performance issues.  In one instance, a performance evaluation that was less than satisfactory was "pulled", as there needed to be 3 teacher observations if there was improvement needed, but only 2 had been performed.

The CBA also includes a grievance process, which Ms. Jelin did initially try to use (but stopped).  That process offers an opportunity for decisions, with which an employee may disagree, to be objectively revisited, reexamined, be changed or modified, if new or relevant information supports such action.  The grievance process can involve layers of review and provides an objective safety net. This appeal process provides levels and a neutral forum for the employee to voice his view and concerns or provide any explanatory information he chooses.  This process, which is outlined in the employee/management agreement at SRVUSD, provides an extra layer of appeal and problem resolution, so exceeds usual management practices.  In dealing with accountability in performance management and corrective action, my opinion is that SRVUSD acted within the scope of their CBA and was consistent with their own policies (which reflect suggested management practice).

SRVUSD has a clear and detailed performance management policy, attendance tracking and process, which provides and reflects a specific organizational culture and context in which Ms. Jelin's attendance issues and accommodation requests were viewed.  It is my understanding, from the information I have reviewed, that time away requests for verified ADA and FMLA/CFRA protected absences were granted. Equipment was provided and periodic technical support was part of that, although the efficacy of that process is challenged by Ms. Jelin.

It is my opinion that the information gathering for events leading to the interactive process and possible accommodation requests, were made objectively and involved layers of scrutiny and review.  In my opinion, SRVUSD implemented the various aspects and steps of their interactive process and accommodation policy with consistency and logic.   Consistency is important to ensure employees are not treated differently due to their membership as a member of a protected group or based on a relevant health care situation. In that context, the focused, detailed documentation and commitment to attempts to accommodate Ms. Jelin (see exhibit 8 for a chronology/sequence that outlines the ongoing, multi-party interactive communication process) are consistent with SRVUSD's stated values, policies and suggested management practices.

The information I reviewed did not provide information, from an HR point of view, to indicate that Ms. Jelin was treated differently/negatively due to her health status.  There was no unilateral decision maker.  Over the years, numbers of staff in different functional assignments within the District were involved in trying to assist in the accommodation efforts. It has been my experience (and that of many of my HR colleagues in the SHRM EEO committee and panels of experts) that the group decision

making process usually results in better quality decisions and is much less prone to bias than unilateral decisions.

***Ms. Jelin's Health***

If an employee experiences difficulty performing their job due to health issues, one option is time away from work. When the various LOA policies began to come into play, there was built in protection for employees who were away from work on a protected and approved medical status. SRVUSD's policy has that included criteria. Ms. Jelin knew of it and used it repeatedly. Another option is to try and accommodate any health care situation in order to help the employee continue their employment in performing the essential functions of their job in a safe and effective manner. Ms. Jelin also knew of it and used it repeatedly

A review of her health over the time of her employment with the District provides an appropriate landscape in which to view accommodation options for various health conditions as seen by a series of treating and examining physicians and medical staff. An early independent medical analysis done in 2010 describes that examination process, the current/later perceived medical conditions extant with Ms. Jelin, but also raises significant questions as to the reliability, timeliness and accuracy of her complaints compared to medically defined health conditions and the possibilities of remediation and treatment for prevention and treatment. Directly quoting from actual case records from recognized neutral, medically expert evaluators……

*QME Re-Evaluation: August 24, 2010*

*Chief Problem: Bilateral carpal tunnel syndrome due to cumulative trauma.*

*"It is now my conclusion that there will probably not be any resolution to this situation. As noted under the record review section of this report, I see that other physicians have come to the same conclusion. There are numerous very unusual features that punctuate this claim. I have served as her QME over nearly two years and do not find that anything has been resolved or improved. If anything, there is a proliferation of complaints". – Dr. Leo R. Van Dolson QME, Re-Evaluation letter, Evaluation on 08/24/10*

*"As expressed by her prior caretakers, it is unlikely that Ms. Jelin will ever find a medical resolution to her numerous complaints. One of her prior evaluating physicians suspected that she would be seeking medical care for musculoskeletal complaints the rest of her life. I would concur with that perspective". – Dr. Dr. Leo R. Van Dolson QME, Re-Evaluation letter, Evaluation on 08/24/10*

*… "in Ms. Jelin's case, there are so many confounding factors that it is really difficult to know what is going on. Ms. Jelin historically seems to be a stressed individual. The article referenced above points out that there is a high correlation between psychological trauma and upper extremity pain complaints". – Dr. Dr. Leo R. Van Dolson QME, Re-Evaluation letter, Evaluation on 08/24/10*

The District engaged in and continued to provide time away from work options with Leaves of Absence, assistive devices for Ms. Jelin's use and technology and environmental support to assist her in performing her job, whether the reported health conditions were personal or reported to be work related.

Jumping *six years forward* to another independent medical analysis in 2016, in which many *prior "problems" are defined as "normal*"…..

*Medical report dated 12-14-16 by AME Dr. John Devore*

*"On February 24, 2015, Ms. Jelin had new upper extremity electrodiagnostic studies done, which showed signs of bilateral carpal tunnel syndrome and compromise of the ulnar nerve at the left elbow.*
*Clinical examination shows that Ms. Jelin's right ulnar nerve remains successfully anteriorly transposed.*
*… I cannot appreciate the need for additional treatment for either of Ms. Jelin's ulnar nerves.*
*Ms. Jelin's elbows function normally.*
*Clinical examination of Ms. Jelin's left thumb shows that her left thumb functions normally.*
*Ms. Jelin has now undergone bilateral endoscopic carpal tunnel releases. There is no sign of weakness or atrophy involving the ulnar muscles of either hand. She demonstrates normal strong opposition with both thumbs. Her carpal tunnel incisions are well healed. There is no indication for additional carpal tunnel surgery.*
*Ms. Jelin demonstrates slight loss of dorsiflexion at both wrists. Otherwise, her hands and wrists function normally. And do not require formal medical treatment.*
*Her right hip functions normally. She probably has some ongoing right inguinal pain due to early degenerative arthritis. Currently there is no indication for additional surgery.*
*On March 03, 2014, I took x-rays of Ms. Jelin's left knee in my office, which showed no abnormality. In late 2012 or early 2013, Ms. Jelin had a left knee MRI scan done, which showed no abnormality.*
*Clinical examination of Ms. Jelin's left knee reveals no sign of impairment. Her left knee functions normally and requires no medical treatment.*
*Cursory examination of Ms. Jelin's left ankle reveals no sign of abnormality. Her left ankle functions normally and does not require medical treatment.*
*Cursory examination of Ms. Jelin's right great toe shows that her dorsal surgical incision at the MP joint is well healed. … Her right great toe appears to function normally now."*

– *Dr. Devor QME, Evaluation letter 12/14/16, examination on 12/14/16*

*Vocational Status*

*"Ms. Jelin should be restricted from very heavy work to minimize problems with her neck. She requires no work restrictions for her elbows, hands, or wrists. … needs to be restricted from keyboarding more than three hours per shift intermittently with other tasks. If Ms. Jelin's work station has not been ergonomically evaluated within the past year, to needs to be reevaluated. … provided with a sit/stand workstation."*

– *Dr. Devor QME, Evaluation letter 12/14/16, examination on 12/14/16*

*"Recommendations*

*Sit/stand workstation*
*Voice-activated software*
*Workstation should be ergonomically evaluated on an annual basis"*

– *Dr. Devor QME, Evaluation letter 12/14/16, examination on 12/14/16*

This medical information seems to indicate that Ms. Jelin's health issues have progressed well, *do not seem to need ongoing medical intervention, surgery or ongoing treatmen*t. Some workplace restrictions remain, but in a continuing refrain, the District engaged in and continues to provide time away from work options with Leaves of Absence and assistive devices for Ms. Jelin's use. Also, continuing technology and environmental support assist her in performing her job, whether the reported health conditions were personal or reported to be work related.

In one situation, which illustrates the *conundrum* facing the District with the *differing views* presented by Ms. Jelin, District administrative and technical staff, treating and independent medical reviews, Ms. Jelin said that she was *no*t being given an accommodation. She claimed, when she went out on a recent LOA, she was being *retaliated against and punished* after she had injured her thumb in the process of lifting some papers. A sequence of excerpts from the deposition of Ms. Katzburg, the Union President representing Ms. Jelin provides some perspective on that situation, which is further information emphasizing/describing the dichotomy in this case….

*Q. Did Ms. Jones state why they were asking Ms. Jelin to take another leave of absence? A. Because she had reinjured herself. – Katzburg Depo – p 34. 18-20*

*Q. … Ms. Jones stated that she had to put Ms. Jelin out on leave, did she state it in a rude manner? A. Not that I recall. Q. Was it professional? A. Yes. – Katzburg Depo – p 36. 5-9*

*A. Ms. Jelin was very upset…she felt that she could continue to work. – Katzburg Depo – p 36. 24-25; p 37. 1*

*Q. Did she state why she felt she could continue to work? A. Because she had been, and the problem that Ms. Jelin was going to experience by being out of work is that*

*the workload would continue to compound and the replacement psychologist wouldn't do the job – wouldn't do the job as Barbara would because she didn't know the students as well. Barbara had developed those relationships already with the students. – Katzburg Depo – p 37. 2-10*

*A. She (Ms. Jones) explained that she wanted to keep Barbara safe and not further injure herself. – Katzburg Depo – p 39. 6-7*

*The Witness: Ms. Jones did not state that the 11/6/15 injury occurred because accommodations were not in place. She didn't say that.*

*Mr. Ly: Q. Do you have understanding of what the 11/6/2015 injury is? ... A… it was caused because Barbara picked up a stack of papers and got her thumb stuck on the wire, and she was not supposed to be picking up things that were heavy. I think it was caused not because the paper was heavy, but it was caused because of an accident. Q. our understanding of the wire getting caught on her thumb is based on Ms. Jelin's testimony to you… – Katzburg Depo – p 40. 14-18; 22-25; p. 41. 1-3*

*A … the doctor's report, there were limitations on how much she could carry, and it differed for each of her hands. And one hand, I think, there was hardly any weight that she could pick up anything so both of her hands had restrictions. – Katzburg Depo – p 41. 11-15*

*So with one hand, I remember there was one pound, so hardly anything. I think the other one was about five pounds. – Katzburg Depo – p 41. 20-22*

*A ... Work restrictions for Barbara said she wasn't to use her left hand and she wasn't to lift with her left hand and she was to use voice dictation and she was to work eight hours per day and she was on temporary disability. – Katzburg Depo – p 61. 4-8*

Ms. Katzburg, of all of the participants in this case, by her very role in the Union representing Ms. Jelin, would seem to be a neutral. Union staff usually becomes an advocate for the employee they represent. In other excerpts in Exhibit 6, Ms. Katzburg talks about her role and her sense of responsibility to *advocate for equity* and the wording and spirit of Union Agreement to *protect* Ms. Jelin.

***<u>Interactive process to explore and consider possible accommodations</u>***

From an HR perspective, the interactive process means the need for open, ongoing two-way, good faith, clear communication. It means responsiveness to questions outlined by the employee and the employer. It is really a partnership and has to involve ongoing working relationships with both sides.

Often, the process can be informal and not based on, or require specific calendared meetings with a certain number of people. Most often, it is a series of more casual

discussions of what is working and what is not. It often involves support help, such as, in this case, IT staff. It means trying to build success into the interactive process by keeping it active. It means effectively managing the intersection of workers' compensation (WC) and medical needs and issues. It means having a sufficiently clear, defined target, plus communication and accountability about who is going to do what, and when.

The interactive process usually results from the employer taking the initiative in the communication and discussion of the decision making process, if the employee has not clearly articulated the problem and possible solutions. It means consistency between written policy information and actual practices. It means dealing with clear, accurate and timely medical information, or getting clarification, if needed, *prior* to making decisions. It means treating the individual with dignity and respect. For the interactive process to work, the employee also needs to treat those staff working with them courteously and professionally.

Ms. Katzburg, president of the staff (and Ms. Jelin's) Union talked about one of the key District figures in implementing the interactive process, Melanie Jones .....

1. *Mr. Ly: Q. What is your opinion of HR director Melanie Jones? The Witness: I've worked a great deal with Melanie Jones. I find Melanie Jones to be extremely trustworthy. I have a lot of respect for her because, her and I may differ in opinions, but we are always able to talk through things, and when I've discussed cases with her, I know that she will listen, and if we disagree, we can take things to the next step, but there's no emotional attachment there as far as me feeling any disrespect towards, her. I know that we're both doing our jobs. I think that she's been a really good director for our district. – Katzburg Depo – p 33. 1-11*

Implementation is making sure managers (and whomever is representing, communicating and implementing the policies) know the organization's policy on equity and are able to confirm employees understand how the policies affect them. In conversation with Asst. Superintendent Rogenski (notes in Exhibit 5), he was able to clearly outline the commitment of the District in trying to get clear information and cooperation from Ms. Jelin to appropriately assist her to be able to continue to work, safely and effectively.

Implementation necessitates adequate communication and credible "enforcement" of the policy. Communication usually means training and making sure all relevant and decision making employees are adequately involved. In their ongoing commitment to equity, Mr. Rogenski outlined a recent training on EEO and ADA issues given to all management staff. Credible enforcement means that the staff and managers charged with implementing the policy are responsive, knowledgeable, thorough and objective. Implementation is making sure managers (and whomever is representing, communicating and implementing the policies) know the organization's policies and

clearly and are able to confirm employees understand how the policies affect them. Deposition testimony from various District staff indicate they were trying to work constructively (if not always successfully) with Ms. Jelin to help her find ways to effectively perform her job.

> *It's hard when we are working with Barbara, because she tends to bring in a lot of different factors rather than just sticking to the main thing that she's trying to achieve, and I think that gets confusing. – Katzburg Depo – p 20. 2-6*

> *… do I recall if Shawn Wells was implying that she wanted to get rid of Barbara? No, I don't remember a conversation like that. Q. Based on her actions, did it occur to you that Shawn Wells was trying to get rid of Ms. Jelin? ... The Witness: I never felt that. – Katzburg Depo – p 70. 19-24; p 71. 1*

> *Mr. Ly: Q. … did you state that one of the notes state that Ms. Jelin didn't follow a computer directive? A. Yes. … A. So Laurel had directed Barbara not to work with people outside of the district. And when the computer malfunctioned and Barbara wasn't able to utilize it, she called somebody else out of the district. – Katzburg Depo – p 106. 23-25; p. 107. 1; 6-9*

> *Mr. Ly: Q. … has anyone ever expressed to you that they just would rather not work with Ms. Jelin for any reason whatsoever? … The Witness: Yes. – Katzburg Depo – p 104. 15-17; 19*

Simple professionalism, responsible keeping of appointments and approaching the situation with reasonable expectations (on the part of the person seeking accommodation) is also much more likely to result in an acceptable process of problem solution. Impatient, demanding, inflexibility seldom characterize a successful interactive process for either the employee or the employer. For an employee to insist on their own way, as a sole process, does not work. The employer has an obligation to try and accommodate, but everyone needs to recognize there are many ways to solve a problem. It may not be the employee "preferred" option that is always implemented. Just because an employee has requested one type of an accommodation, does not mean that it is the only or even most reasonable way for an accommodation to be made.

Industry standards require the employer and employee to engage in the interactive process to determine reasonable accommodations. The interactive process is an ongoing, good faith dialogue – without undue delay or obstruction by either employee or employer – whereby the employee, health care provider and employer collaborate and share information about the nature of the disability and the limitations that may affect the employee's ability to safely and effectively perform the essential job duties. Many publications and agency guidelines stress that an employer has to operate in good faith with the employee. However, there are two sides to this issue in granting reasonable accommodation for a disability. That also requires that the employee approach the

situation candidly and honestly, without trying to take advantage of an employer's attempts.

Ms. Jelin knew what the working conditions were, what the environment was and what the job demands would be. If she would / could not perform her schedule or assignment with students, that may lead to her need to leave the workplace on several occasions and not complete her scheduled workload. There are legally mandated and required processes and report formats in dealing with special needs students. This placed a larger burden on other employees, who had to pick up the responsibilities that normally, they would have anticipated that Ms. Jelin would have covered in her scheduled work. This is not a question of costs, but of *disruption and impact*.

> *Did Melanie say "No one else on the planet has these same problems"? A. No. That was probably me. Q. Did Melanie tell you that they were "going to deliver her a directive tomorrow that she can only have one computer, and that only district technicians can work on it and she is not to call anyone else"? A. Yes. – Katzburg Depo – p 81. 17-24*

The purpose of the interactive dialogue is to determine what (if any) accommodations may be needed; identify possible accommodation options, and assess the possible and intended accommodations. Industry standards further require an employer to conduct a fact-specific, individualized assessment. In this case there was frequent medical information about the restrictions and, if necessary, time away from work. The ongoing technical attempts to coordinate the individual and tailored computer equipment and software involved multiple technical representatives from the district and specific equipment for Ms. Jelin's sole use. This interactive process was not just a single conversation. As described by Mr. Rogenski, the District spent more time and effort in trying to coordinate the interactive process with Ms. Jelin than all of their other disability situations combined.

Undue hardship

One aspect that has not previously been discussed, is the salient question of whether or not, the request/demands for a certain type of accommodation are realistic or may pose an undue hardship on the District. I am not opining that there was an undue hardship, but simply pointing out that this is an appropriate area *to consider* when designing and defining what is *reasonable* in an accommodation. That encompasses whether the accommodation(s) would constitute an undue hardship by fundamentally altering or *disrupting* the nature or operation of the job or business.

EEO agency guidelines indicate factors to consider include:

- the overall financial resources of the entity as a whole;
- the overall financial resources of the facility or facilities involved;
- the number of persons employed overall at the facility or facilities involved;
- the number, type and location of the facilities;

- the type of operation of the entity, including the composition, structure and functions of the workforce of the employer;
- the nature and cost of the accommodation needed;
- the impact of the accommodation upon the operation of the facility, including the impact on the ability of other employees to perform their duties; and,
- the geographic separateness, administrative or fiscal relationship of the facility or facilities.

However, it is not just an economic evaluation.

Another component is how *disruptive* granting an accommodation might be. If there are unplanned absences that need to be covered at the last minute, necessary work that remains uncompleted, reports that are not done in a timely way or communication becomes tense and heated, that is *disruptive* to the way in which the business of the District gets completed. As many of the aspects in dealing with special needs students are legally mandated, that can create an extra layer of emergency staffing to get things done with effectiveness, needed documentation, timeliness and safety. Not functioning effectively, sudden and unplanned time away from work, not keeping up with e-mails and communications, not attending scheduled meetings and unclear or ignored communications can *add to the disruption.*

A qualified person with a disability

This is another aspect to the discussion of *reasonableness* in accommodation. Is an employee able to perform the essential functions of the job safely and effectively? This is a germane area of discussion, given the question of whether or not Ms. Jelin can *safely perform the job without the likelihood that she might reinjure herself*. At one point she was put on LOA after injuring her thumb in the lifting of some papers, as she had more extreme limitations and the District administration questioned her ability to *safely* perform her job. Ms. Jelin vociferously complained about being taken out of the workplace. She perceived she could continue to safely work. The District staff did not.

Performance and behavior in meeting the performance expectations in *how* the job is performed is also a factor in deciding if a person is "qualified" to effectively and safely perform their job. There were continuing verbal and written performance reminders and evaluations that more specifically discuss in the performance management section of this report as in Exhibit 7 (recent performance evaluation).

***<u>Accommodation</u>***

Accommodation is usually the result of a communication process between the employee having problems doing their job because of health issues and the employer. One way to determine if the employer is aware of their basic responsibilities in this area is to ask for a listing of some of the types of accommodations they have previously made or are currently being provided. Being careful to honor employee privacy, I specifically asked for a list (of such sample accommodations) to not disclose employee names. However, some way to identify employees is necessary in order to verify the

information, if needed. The District provided such a list. Some of the accommodations were provided for employees with Worker's Comp situation and others for non work related situations. Accommodations covered a broad spectrum of types of accommodation, ranging from:

- job restructuring,
- LOA,
- Provision of special equipment and devices,
- modification of the job duties,
- physical limitations and restrictions such as lifting and certain kinds of motion and movement,
- defined rest periods,
- heat adjustments in the classroom,
- schedule adjustments

This list spans a wide variety of approaches and accommodations designed to help a broad number of employees to have modifications that have been implemented to allow or enable employees continue to work. This should provide ample evidence that the District staff is knowledgeable, flexible and creative in engaging in problem solving to provide accommodation for disabled employees

One aspect to review in considering accommodation, is needed time away from work. The purpose of a leave (LOA) as an accommodation is to give the employee time to become able to perform the essential functions of her position upon return to work, with or without a reasonable accommodation. The need for leave must be related to the disability and the leave must be likely to enable to employee to return to work. Therefore, in assessing a leave request, the employer should determine the specific purpose of the leave. What will the employee be doing that will enable her to perform the essential functions of her position with or without another workplace reasonable accommodation?

Ms. Jelin was granted multiple periods of requested time away from work for her health reasons. She also took time away from work for other reasons, such as bereavement and jury duty. The District did not challenge the legitimacy of her medically related times away from work. They did not question her doctors' statements, even when conflicting information was proffered by her physicians. They never mandated a fitness for duty examination. Most of Ms. Jelin's requests for time away from work were described (by her) as job related. As a result, they would be covered under Workers' Compensation, which provides protections including both medical treatment and analysis and income supplements. That seemed to be an ongoing pattern over the last several years. She also received income supplements to help cover the impact of any lost wages during periods when she was away from work.

Can it work?

Additionally, Ms. Jelin also requested, needed/demanded equipment and work station set ups to help her function within stated physical limitations. This became another ongoing situation of obtaining the correct and compatible software and appropriate

ergonomic and computer software and equipment. The EEOC guidance indicated that an accommodation should anticipate helping the person be able to perform their job going forward. It is prospective. If the interactive process is fraught with dissent and hostility, that is not consistent with the goal of an accommodation.

The information I reviewed indicated that for several years, the District has attempted, seemingly in good faith, to provide encouragement, equipment, assistive devices and software to support Ms. Jelin to be able to safely and effectively perform her job. When the result is constant criticism from one side of the table, that throws the interactive process out of alignment. Frequent and ongoing accusations and complaints from Ms. Jelin exacerbated the coordination needed for a successful and reasonable accommodation. These differences between Ms. Jelin and District staff became a true saga spreading over years. It raises the question of is there a reasonable way to accommodate Ms. Jelin that works and is safe and effective?

Technology

A 33 page technical summary complied by Deanna Lashin (IT for the District) details help provided and requested by Ms. Jelin from August 4, 2016 until May 11. 2017. For a report to be this detailed (and only cover a 10 month period), it means there were a lot of requests and a lot of work done by District technology staff focusing on correct and compatible hardware and software as assistive devices to help Ms. Jelin be able to effectively and safely perform her job. Ms. Jelin was frequently in disagreement with the quality, skill and intelligence of the staff and quality, and appropriateness of the equipment provided.

Things would be adjusted and reportedly operating effectively by the tech. Then, when the tech left, the equipment was reported not to be working by Ms. Jelin. Remote "adjustments" could (and were) often made, when Ms. Jelin said she was encountering difficulties. Ms. Jelin insisted on purchasing her own equipment (to be reimbursed by the District) and getting in her own consultant, outside the District's usual contracting and vendor list.

In her deposition, when asked "what is the problem" ? Excerpts from the Lashin deposition indicate…..

> *Specifically about the headphones I remember feeling very uncomfortable in the room at the time. I remember that they were tossed or thrown or there was some type of violent action with the headphones. I don't remember exactly what it was. – Lashin Depo p. 17. 11-15*
>
> *meeting where I had made an appointment with Barbara to demonstrate the issues she was having with the ThinkPad. We had looked at it several times before. I wanted to have an opportunity to see what she was doing it from how we were testing it to make sure I could resolve her issues. Q. Okay. Were you able to resolve the issues? A. I was not – there was no demonstration provided*

*at the meeting, even though that was the intent of the meeting; so I wasn't able to gather any additional information from it. – Lashin Depo p 22. 6-17*

*Q. … I realize there have been several that you talked about – Ms. Jelin's fault, that she misused the equipment somehow? … The Witness: I couldn't be sure what the cause was. – Lashin Depo p 30. 3-6; 8-9*

*A. So the summary was requested after the initial emails occurred as far as the updates. – Lashin Depo p 43. 4-5*

*. … once the newer version of Dragon was purchased and delivered and installed, then it [MS Office] was changed back to 2016 because that's the version that's compatible with the newer version of Dragon. The H and F drive was the result of the network issue. I had additionally provided her an adapter directly connected to the network. If she was experiencing wireless issues, she could use that as a backup as well. – Lashin Depo p 45. 9-17*

*A. … corrections were completed at her request over break in response to her work order 20310. Reverted the office version, which we confirmed there was licensing for, back to Office 2013 on both the T4E – excuse me – T430 and the IdeaPad. – Lashin Depo p 46. 18-22*

*A. … And then moved her H drive documents, which is the individual user share for each employee, when we refer to H drive. Moved those locally at her request. So if it inadvertently – if she needed to get those when the network is not accessible, she would still have access to those…– Lashin Depo p 46. 23-25; p 47. 1-3*

*A. I mean, traditionally if the site tech wasn't able to either repair or produce the issue, they would contact us for assistance, and then, like-minded, if we were unable to resolve or repair the issue, then we would look for other resources to resolve it. Q. Have you looked for other resources to resolve the issues? A. I've done personal research on blogs for Nuance. I've contacted them, gone through the setup and installed it and tested it with different equipment for own personal experience. Q. Do you have an opinion or belief as to why Ms. Jelin continues to have problems? A. No. Q. Has she suggested a solution? A. I know she's asked if we reached out to Nuance a number of times, and we have. – Lashin Depo p 48. 13-25; p 49. 1-4*

*Q. In your opinion, what is the problem? … The Witness: … I can't be sure what the exact issue is. – Lashin Depo p51. 4-7*

*A…and returned it in working order each time; so. Q. When you returned it in working order and then there's an issue, does the issue have to do with what it was you were working on? A. I couldn't be sure that was the case all the time. It*

*may have been a related issue, and at times I'd remote it after and, you know, check the box or make a quick fix and correct it. – Lashin Depo p 51. 11-20*

*A. … it's technology. – Lashin Depo p 51. 24*

*Q. Has anybody suggested just starting over, getting all new equipment and installing the current version of Dragon? A. I know that we talked about – and I believe we did wiping the – wiping the hard drive of the IdeaPad and reinstalling Windows 10 and Nuance new, and, to my recollection, that was done when the new version of Dragon came in. – Lashin Depo p 51. 25; p 52. 1-7*

*Q. And did the wipe clean reinstall work? A. I mean, to the best of my knowledge, it did. – Lashin Depo p 52. 10-11*

These processes were driven by frequent and sometimes impatient demands by Ms. Jelin to get things done the way in which *she wanted them done*. She wrote a memo to Ms. Katzburg, her Union president on Nov 6th, 2016, which outlined her continuing concerns and complaints about the technology process. Some of the points she mentions are in *direct conflict* with information provided by District tech staff, (such as them not loading compatible software and their contacting Nuance software). I*n 2018, an outside consultant that Ms. Jelin insisted come in, came on site and conducted an assessment.*

*Source Documents: Barbara Jelin Declaration / Exhibits*

---

*Worksite Ergonomics and Assistive Technology Report 1-28-18*

*I met with her to review her current set ups and make recommendations for possible improvements.*

*Computer Access*
*Ms. Jelin has a long history of trying to get the Dragon speech recognition software working as a reliable alternative to typing. Despite various upgrades, she continued to report persistent errors and difficulty with saving her voice profile. With IT staff from the District present at the Live Oak site, I was able to troubleshoot and resolve her current difficulties. I also identified that she had not received adequate training in the use of this complicated program. – Worksite Ergonomics and Assistive Technology Report, (RET) Project, The University Corporation, SF State, Report date 01/28/18 by Ray Gott*

*I next explored her mouse use.*

*I had her try various other options and spent the most time helping her compare the Kensington Expert Mouse trackball with the Adesso Smart Cat touchpad mouse, paying careful attention to their exact height and angle. She ultimately opted for the*

*touchpad style mouse, placed to the right of the keyboard. I also demonstrated the VoiceComputer software add-on to Dragon, … – Worksite Ergonomics and Assistive Technology Report, (RET) Project, The University Corporation, SF State, Report date 01/28/18 by Ray Gott*

*Workstation Ergonomics*

*… she experiences less strain in her upper extremities when she is accessing the keyboard and mouse at a significant negative tilt – well beyond what her adjustable keyboard can provide. Fortunately, she had acquired foam wedges shaped to accommodate her keyboard and she found the most relief when we combined this with the adjustable keyboards set to its maximum tilt and at the most appropriate height.*

*Ms. Jelin needs to alternate between sitting and standing .She already has a motorized adjustable desk in both offices, which is a great start point.*

*Ms. Jelin informed me that she has the same desk, keyboard tray, keyboard, laptop rise and 3M copy holder at her second office at the Tasarjara school site…*

*Ms. Jelin has been using her personal Jabra Bluetooth microphone for the speech recognition and it appears to be working well enough, though she must remember to bring it back and forth between the two school sites. – Worksite Ergonomics and Assistive Technology Report, (RET) Project, The University Corporation, SF State, Report date 01/28/18 by Ray Gott*

This information confirms that, while the District had its own internal IT staff that had worked closely with Ms. Jelin for several years, she insisted on an outside vendor that did not have a preapproved status with the District. The District agreed to bring this organization/person in. He worked with the District's own internal IT staff. He confirmed Ms. Jelin already had pre-existing assistive equipment, but needed more training in the Nuance software, He confirmed it was working. The District staff worked with him to make sure all was properly connected. District staff had *previously* confirmed the Nuance software was appropriately connected and working.

Why ongoing technical issues?

Just as Ms. Lashin did not state her opinion about *why* Ms. Jelin reported there were many years of continuing computer and equipment glitches immediately after they had been checked out and found to be operative, no one else has articulated "why" there is such a continuing saga that seemed to focus almost exclusively on Ms. Jelin's experiences. It is apparent that there was *ongoing communication* and back and forth dialogue. The District was addressing Ms. Jelin's concerns, albeit not with the results she wanted. Ms. Jelin was not being ignored. Dialogue with tech staff, school/administration staff and the president of Ms. Jelin's union *continued to focus on*

*trying to resolve* Ms. Jelin's complaints and concerns, even though Ms. Jelin seldom expressed satisfaction.

While not meeting Ms. Jelin's stated standards or desired outcomes, the communication that characterizes an ongoing interaction between Ms. Jelin and multiple District staff did occur. There were formal documented meetings, there is and has been ongoing e-mail communication, there is a detailed summary of technical support issues and there is a voluminous amount of medical work status reports. The question is not the amount, frequency and specificity of communication, it is whether it made Ms. Jelin happy.

> *… Barbara believes that the district hasn't done enough to support her with the technology because there's been multiple issues with technology and there's been principals that have demanded excessive work that she can't fulfill. – Katzburg Depo – p 43. 6-10*
> *The Witness: I believe that they have done a lot to support Barbara with the technology. Mr. Ly: Q. What do you mean by "a lot"? A. So they have met with Barbara. They have provided Barbara with the software. They have bought Barbara a computer to go along with the software. They have sent people to work with her and support her throughout this time period so that she can do her job. – Katzburg Depo – p 47. 7-14*

***Performance management***

Ms. Jelin complains of harassment and retaliation in her various complaints. She feels that being given workplace directives and reminders in what is expected from her are harassing.

Key elements (HR basics) of performance management are that:

1) The employee has a clear picture of what their job responsibilities are (and what the priorities are for the organization). This is captured in the job description for a school Psychologist.
2) *If* there is a gap between what the expectations are and what the organization is receiving from the actual employee's performance, that gap needs to be identified, clearly communicated with the employee. That was done.
3) The next step is a specific plan, with a reasonable timeframe to measure improvement outlined, so that the employee understands what is expected of him, what type of timeframe, the level of change or improvement that may be needed, and the impact of what they were or were not doing in the workplace or in performing their job.
4) If, after conversations with the employee covering these areas, things do not change sufficiently or on a sustained basis, management may need to revert to a corrective action or formal "disciplinary" process.
5) Corrective action is generally incremental, usually beginning with verbal conversations, followed by written documentation and a defined plan for improvement.

6) If there continues to be a problem, a more defined improvement plan with set benchmarks may be helpful, as well as a period of time in which that improvement is going to be scrutinized and documented. Yardsticks are established, improvement is quantified and who is going to be reviewing the performance is designated, as well as how that will be done.
7) If it still continues to be a problem, the consequences of a continued performance gap need to be identified and the employee needs to have an understanding that their employment may be in jeopardy.

These would be the usual and routine steps taken to monitor employee performance. Usually, if there are behavioral issues, a gap in performance or if something is a bit awry, a forthright conversation with an employee can often cure the situation without any further action being needed. That does not seem to be effective in this case.

The principles of a performance review are based upon giving the employee a clear understanding of their job responsibilities, and making sure that the employee has the opportunity, skills and understanding to be able to competently do their job.

Ms. Jelin has received multiple corrective actions steps to help her improve her performance. Most recently, in her April 25, 2018 performance evaluation, in part, (see Exhibit 7 for full review) she was told:

- *Barbara does not consistently respond to emails in a timely manner.*
- *Barbara has spoken to coworkers and administrators in a disrespectful or sarcastic tone. … She also asked for extra paid hours in order to complete tasks that are already a part of her job description.*
- *Barbara has had difficulty working collaboratively with the SPED team. We have provided additional support for the SPED team by having District and SRVEA leadership joining team meetings.*

*Comments: To move from emerging to proficiency, Barbara can:*

- *Respond to emails within 24 hours*
- *Communicate and collaborate with IEP teams*
- *Be open to differing points of view and engage in respectful dialogue*
- *Listen while others are speaking*
- *Complete reports in a timely manner*

*Developing as a Professional Educator*

*Barbara has required extra time to complete reports and has worked with the team to decide on an appropriate format to store the reports.*
*Comments: This has been an area of concern all year. Barbara has not been open to feedback in this area and typically deflects responsibility onto other team members.*

*To move from emerging to proficiency Barbara can:*

- *Be open to feedback/suggestions regarding professional growth.*
- *Manage time efficiently such that professional responsibilities are completed within allotted time limits.*

*Summary Strengths:*

- *Builds rapport with parents at beginning of IEP meeting*
- *Students report that Barbara is supportive*
- *Maintains confidentiality*

*Recommendations:*

- *Maintain a professional and sensitive demeanor when supporting families during IEP meetings.*
- *Work on conflict resolution skills to facilitate teamwork to determine how to resolve conflicts and come to agreements.*
- *Attend conflict resolution training as determined by district leadership.*

– *Barbara will be a collaborative and cooperative member of the special ed team.*
Unsatisfactory *Ms. Jelin's Response ….“I am not in agreement with this evaluation. Misleading: and or factually inaccurate information.”*

Issues needing improvement and areas where performance is good have been identified. Ms. Jelin disagrees.

Workload

A component that impacts job performance is the workload. Ms. Jelin has consistently complained that she has a heavier workload than others in her position. She cites that an ever increasing workload as retaliation and also the reason she is not meeting deadlines and getting required parts of her job not completed in a timely way. She says she has too much to do, cannot get through daily emails and get her reports done. She said that she has been told not to provide mandated services to students. That is seen differently by District staff. In their memos to her, they have reminded her about due dates. Ms. Katzburg addressed the issues of uneven workloads for Ms. Jelin…

> *“It's been challenging. Barbara has many issues beyond, you now, the physical. It's meeting the needs of her assignments. There's been delays in her reports. And that she does send us lengthy emails and discusses the amount of time that she needs to do her job, but I would imagine we've discussed the fact that the emails themselves probably take a lot of time, too. – Katzburg Depo – p 56. 3-9*

> *Q. … Ms. Jelin's workload is on average with other school psychologists at the district? A. Yes. – Katzburg Depo – p 50. 7-9*

> *. Ly: Q. …how many assessments Ms. Jelin has to do in a given school year? … A. I would estimate that it could be anywhere from 30 to 50. Q. Assessments in a given*

*school year? A. Correct. Q. Is that about average for other school psychologists you have represented? Yes. – Katzburg Depo – p 51. 4-5; 10-15*

*… Melanie said that in order to receive payment for the hours, you need to ask prior to doing the work. …. Melanie said that psychologists in the district all have to do work that goes beyond the workday and she couldn't make a separate allowance for Barbara … – Katzburg Depo – p 65. 12-17*

*Q. May 5th, 2016 notes. … A. During the time that Barbara was out, the team did not expect her to make up those assessments that were assigned during the time she was absent. – Katzburg Depo – p 86. 23; p 87. 21-23*

*… emails there's a lot of things that are compounding on this issue in addition to the technology. … Barbara comes back to work and attempts to comb thorough emails, she won't be able to do anything else, whether or not her computer is working, because there's so many. – Katzburg Depo – p 91. 5-6; 10-13*

*… Melanie is saying to her that's your job responsibility to get through emails, that would be … when she's working, if somebody is emailing her currently, it's an expectation that we get – as an employee of the district, that we get through those emails. Communication is important, so if Barbara is getting information and not looking at the emails and not understanding what the next steps are, that could be problematic. – Katzburg Depo – p 91. 14-23*

*The Witness: I have heard that Barbara has a hard time getting her work done because her reports are lengthy. – Katzburg Depo – p 101. 15-17*

***Conclusion***

From the information I have reviewed, the District has made ongoing and repeated attempts to provide the appropriate tools, equipment, resources and support that Ms. Jelin has requested, to perform her job safely and effectively. It *never seems to be enough*. As outlined by Keith Rogenski, Ms. Jelin is "an ongoing series of complaints, rather than suggestions". It just seems to go on and on, and "nothing is ever good enough or lasts long enough for her to be satisfied". He said a lot of staff has taken a lot of staff time and energy to try and meet her requests and needs.

"It is a question of reasonableness. She is not reasonable. She wants to work the minimum 7-hour day, prescribed in the contract, rather that working until the job is complete". The ergonomic equipment that is purchased is "never good enough". She "characterizes simple directions received from her principal as being harassment". She periodically "fires" her Union rep, who is her actual advocate." He questions if it can ever be "OK and work"?

Her medical histories outline different perspectives of what Ms. Jelin seems to experience healthwise and how she has outlined her prior history. The differences

present important contrasts. These information contradictions seem mirrored in the diverse and contrasting medical opinions and examination results of two totally different independent physician experts that interviewed and examined her. On one hand she seems in good shape. On the other one, various restrictions are outlined, but then her frequent work status reports periodically claim that she is "totally to partially disabled" and not able to work or her range of motion and work is quite restricted. One physician (Dr. Dolson in 2010) seemed to almost be prophetic in his assessment that Ms. Jelin will probably "never" resolve her chronic medical situations. He cites the medical prognosis and history as very unusual.

Then you add the three most recent instances in which Ms. Jelin reported injuring her self at work by running into a doorway, hyperextending her thumb, and placing herself in front of a door to stop a 10 year old boy from exiting the room (which was not part of her job responsibilities or training). At best, these could be described as "'strange" and not common to her workplace, and not indicative of any defined workplace hazard, although they were handled under Workers' comp.

The District seems to have actively engaged in frequent and ongoing communications to accommodate Ms. Jelin. That interactive communication is consistent with suggested management practices. They face an unsolved, conundrum in spite of their seemingly appropriate efforts. Is it solvable? The steps and sequences in the interactive process are seldom perfect, but the attempts and actions taken by the District and the support the District provided meet and in some cases exceed usual practice in trying to establish a successful exploration of accommodation.

Rhoma Young

Exhibit 1 RY Professional background

HR Expert Witness Report

RY Professional background relevant to the Jelin matter

Over the last 35+ years in human resources, I have thoroughly examined the Human Resources (HR) policies and practices of many organizations, evaluated their effectiveness and make recommendations for change. Human resource and equal employment practices apply to recruiting, hiring, promotions, discipline, training, termination and compensation. . . basically all of the areas in how employees are selected and treated.

My consulting clientele is diverse in size and industry, ranging from Fortune 100 companies to small and mid-sized employers in health care, construction, manufacturing, retail, trucking, distribution, financial services and high tech. I have worked with numerous private companies and public entities in looking at policies, the implementation of those policies, their HR practices, staffing, performance management issues and problem investigation and resolution. During my career, I also have a rather extensive background in working organization with a collective bargaining agreement (CBA, or MOU) in effect. This often brings an additional layer of complexity to a situation, the communication to resolve issues and decision making process.

I taught Human Resource professionals at San Francisco State University, UC, Berkeley and Mills College. I have worked as an expert witness in many cases (testified in court over 100 times) and had to minutely examine the step-by-step HR practices that are the implementation of HR policies. As part of my human resources consulting, I also advise organizations on policy content and implementation in a broad array of Human Resource areas, including case management in dealing with employee health and potential disability communications and implementation of accommodation issues.

A key area in my consulting practice is the conducting of policy and management practice audits. A routine part of this audit practice covers Leaves of Absence (LOA), time away from and return to work policies, the implementation of disability case management, exploring practical and creative potential accommodations and the interactive process. I have also advised and provided oversight to performance management issues and accountability in both union and non-union settings.

Much of my work over the last several years has focused on advising organizations how to prevent and respond to issues and complaints of discrimination. One of the major ways in which this prevention is demonstrated, is making sure that an organization has adequate and clear policies, including a working complaint and problem resolution mechanism.

Working with clients, I have advised organizations, investigated workplace issues and helped resolve highly sensitive situations that have involved allegations of

discrimination, harassment and retaliation. The span includes issues of race, age, ethnic/national origin, gender, gender orientation, religion, disability and health related issues and other perceived problems of equity in the workplace.

I have researched labor market trends, skill and experience analysis and employment criteria as part of helping employees and employers define options in accommodation issues. I have also coordinated periodic functional analyses of both jobs and employees to determine possible “fit” into prior or alternative jobs.

If additional information becomes available, I will review it and be prepared to respond or submit an addendum to this report. I charge $495 per hour for research and analysis and $595 per hour for expert witness testimony. Fees from trial testimony are donated to the American Cancer Society. I have also co-authored two peer reviewed White Papers for the Society of Human Resources (SHRM) on prevention of discrimination/harassment in the workplace and the standards of care in investigation and resolving employee complaints and workplace problems.

**Exhibit 2 CV**

**RHOMA YOUNG, HR Consultant**
Oakland, CA
(510) 530-6746
RYAA@earthlink.net
RYAA.com

## *Professional Experience*

**RHOMA YOUNG & ASSOCIATES**, 1983-present

Managing Principal of successful HR/business consulting firm focusing on practical, common-sense and cost effective approaches to business and human resource management issues and problems. Clients range from large, Fortune 50 organizations, to ground breaking hi tech organiztions, to smaller electronics, bio-tech, distribution, health care, financial/ professional services, software development, food processing, construction and manufacturing firms. Clients are public and private companies, not-for-profit organizations, individuals and local, state and federal governmental organizations.

- A recognized expert in HR and equal employment, which mandates active involvement and familiarity with the many facets of human resource management -- employee/labor relations, compensation and benefits, training and management development, organizational transition management, strategic planning and recruiting. Special projects include designing equity and fairness into a broad array of complex issues, such as:
    - facilitating definition and resolution of "dicey" performance management situations
    - disability and accommodation/return to work case management options using the interactive process in a wide array of industries
    - design of special recruiting and employee selection programs to foster inclusion
    - comprehensive audits of the design and implementation of HR policies and practices
    - executive coaching
    - workforce restructuring

- Frequently use the hybrid background of being on both sides of the labor bargaining table and decades of professional HR experience with public, private and not-for-profit employers to testify as an expert witness for both plaintiffs and defendants in depositions, arbitrations and in litigation involving discrimination, harassment, retaliation, disability and mitigation of damages. This includes related HR areas, such as employment background screening, hiring and

selection, employee development, workforce planning, investigations, efforts "to prevent" and the more generalized aspects of performance management.

- Frequently asked by an organization's top management and/or Board of Directors to act as a "neutral third party"--investigating, analyzing, mediating/negotiating and gaining acceptance of, sometimes, creative or non-traditional solutions. This is often in very complex, dramatic and high profile situations of percieved unfair treatment, overt and covert bias, discrimination, harassment, retaliation and performance management situations.

- Conduct one-on-one, intensive "charm school" sessions to help executives and managers communicate and manage more effectively and advise their management on how to best support needed changes. Also have been sought out by organization executives to provide ongoing, one-on-one executive coaching.

- Use a broad knowledge and extensive experience with varied industries, career areas and labor market analyses to conduct targeted executive search activities, assess the viability of individual job search efforts, provide individual and group career planning/coaching and customized outplacement. Consult and provide expert witness testimony in mitigation of damages, evaluate individual job search efforts and research and explore viable options for labor market/marketplace/occupational assessments.

- Building on extensive experience in workforce and workplace reorganizations and reductions, design highly tailored programs to maximize continuing employee commitment and productivity. This covers planning for, communication and implementing decisions about who stays and who goes, accompanying legal concerns, benefits, outplacement, separation packages, and transition counseling/communications. My work deals with the fears and expectations of those "left behind", while also focusing on skills needed for future organizational needs.

- Taught at University of California, Berkeley, Mills College and San Francisco State University, teaching classes in Affirmative Action/EEO, managing employee performance/performance appraisal design, workplace investigations, resolving employee concerns and defining employee accountability.

**<u>BOISE CASCADE CORPORATION</u>** (31,000 employees), 1980-1983
*Multibillion dollar paper and forest products company with 250 + locations, headquartered in Boise, Idaho.*

Directed corporate-wide division and employee relations staff on Equal Employment and Affirmative Action Plan and compliance. This included conducting and providing corporate oversite and direction of over 250 Affirmative Action Plans and Company –

wide complaint investigation, negotiation and resolution.  Designed and implemented corporate EEO/AA policies and program initiatives to support business strategies aimed at, often creatively, increasing ethnic, cultural and gender representation and diversity, including the disabled and expand career options for women in traditionally male dominated jobs and industries.

**GENERAL MOTORS CORPORATION**, Fisher Body Division, 1978-1980
*28 metal fabrication, trim, hardware, engineering/design and automotive assembly plants, 90,000 + employees, Detroit, Michigan.*

On Division Labor staff, then managed labor relations at the downtown Detroit Fleetwood (Cadillac) assembly plant, (5,000 plus hourly employees) to negotiate and get support for, then implement and administer a complex local agreement.  The focus was on reducing a high grievance volume and convince a militant and divisive union local to recognize, and ultimately participate in and support ambitious mutual union/management goals for improved quality and profit.  This occurred during a period of major layoffs and stepped up productivity requirements in an increasingly competitive marketplace.

**COUNTY OF LOS ANGELES** (83,000 employees), 1964-1978
*Fourteen years of progressively responsible experience in personnel, the Chief Administrative Office and the Probation Department.*

As a Probation Officer, investigated and supervised adults and juveniles in custody and residing in the community. Implemented a more systematic method to objectively assess and identify feasible options for Superior Court judges in sentencing convicted felons, including that challenge of whitee collar crimes with hoped for restitution.

Directed a highly effective job placement program to successfully get jobs and employ ex-offenders in a wide array of industries.  Worked closely withbusiness organizations and labor unions to increase employment retention on inmates released from custody.  Advised Correctional organizations on viable internal and external occupational training options matched to the actual job market.

In HR, audited County HR practices and then implemented major changes in training, personnel/HR practices, compensation structure, budget priorities and information systems.  Researched and implemented job share, half and flex-time positions, a managerial potential assessment center and career development program.  Active in CBA negotiations on both sides of the bargaining table with SEIU and AFSCME.

## *Education*

M.A., Administration and Management, Pepperdine University, Los Angeles

Graduate work and executive development programs in business management, supervision, employment, labor-management negotiations and employment/labor law, and HR policies and practices:

- Wharton School, University of Pennsylvania
- University of Chicago
- UCLA Graduate School of Business Management
- Cornell University, Weinberg Fellow, School of Industrial and Labor Relations
- California Institute of Technology, Industrial Relations Center

Certificate in Counseling and Psychology, University of Southern California
Certificate in Conducting Workplace Investigations, AWI Institute

B.A., History, University of California, Los Angeles

## *Additional*

Was on the business advisory committee to the Board of Directors for privately held, but rapidly growing Specialty's Bakery/Café headquartered in San Francisco. Actively participated in the eventual "liquidity", when sold to FEMSA.

Continuously active on the Boards of several community and non-profit organizations, doing strategic planning, Human Resources and fund-raising

Coro Foundation CityFocus participant

Co-authored two extensive, peer reviewed White Papers published by SHRM.
"Unlawful Workplace Harassment: An Ongoing Employer Challenge"
"Is there a Standard of Care to Define a Reasonable Harassment Investigation?"

On the editorial Board of the Employment Resource Advisory Institute (ERI)

Certified as Workplace Investigator after completing the intensive Association of Workplace Investigators Training Institute.

Member/Participant representing the Human Resource field and perspectives on the Equal Pay Task Force as part of the California Commission on the Status of Women

## *Professional Affiliations include:*

Association of Workplace Investigators (AWI) coordinated the Bay Area Local Circle

Active member of DMEC

Previously active on the national panel of experts for the Society of Human Resource Management (SHRM) in Diversity and Equal Employment. Longtime member of the national SHRM Legislative and EEO Committees

Active in the Northern California Human Resources Association (NCHRA) and was long time chair of the Legislative Committee

Recipient of the NCHRA Special Service Award

Licensed Private Investigator (California)

---

## Rhoma Young's Background on Labor Market Information, Occupational Assessment, Career Planning and Mitigation of Damages

Over the last 30+ years in human resources, I have thoroughly examined the Human Resources policies and practices of many organizations, evaluated their effectiveness and made recommendations for change. The human resource and equal employment practices apply to recruiting, hiring, promotions, discipline, training, termination and compensation . . . basically all of the areas in how employees are selected, treated and held accountable.

My consulting clientele is diverse in size and industry, ranging from fortune 100 companies, to small and mid-sized employers in health care, construction, manufacturing, trucking, distribution, sales and marketing, retail, financial services and high tech, both union and non-union.  Clients also include government and nonprofit organizations.

I taught Human Resource professionals at San Francisco State University and related classes at UC Berkeley and Mills College in employee accountability through discipline and termination, improving workplace effectiveness through performance management and investigating and resolving employee complaints. Over the last 20 years I have worked as an expert witness in numerous cases and had to minutely examine the step-by-step implementation of policies and practices, plus assess and analyze, then testify on mitigation of damage efforts.   I have testified in several cases about the mitigation of damages and possible income loss in employment cases for both plaintiff and defense and in divorce litigation.

As part of my consulting practice, I also conduct employee recruiting and executive searches to help employers accurately assess their needs, source applicants, conduct the employee selection process and negotiate the "closing" process of final compensation, reference checking, future job content and performance expectations.  In doing Affirmative Action Plans for employers, I also researched skill/occupational, Labor Market Information, employee compensation and demographic data to define the most reasonable external "benchmark" which most closely mirrors an employer's workplace and employee population.

I work with organizations that are going through workforce reorganizations and restructuring that involve hiring, terminating and transferring employees and defining their current and the organizational skill needs and experience to find out if there is a match.  If there is not a match, I have researched, designed and conducted effective outplacement programs designed to focus on facilitate and enhance the affected employees' reemployment.

I have researched labor market trends, skill and experience analyses and employment criteria as part of helping employees and employers define options in disability accommodation issues.  I have also coordinated periodic functional analyses of both jobs and employees to determine possible "fit" into prior or alternative jobs.

As part of that work, I keep current on general labor market issues, trends and forecasts, as well as actual occupational analyses.  I often assist and coach employees on the most practical and effective way to way conduct a job search, market their skills and talents.

In mitigation assessments, I am frequently supported by a group of very able associates to conduct thorough research and keep total project costs manageable. Employment research often includes individual conversations with industry experts and hiring managers to get an accurate and practical picture of the current and recent hiring activity. These conversations usually yield customized and specific circumstances and insights that might affect career options.  Such conversations enhance and expand the usual LMI research by taking a personalized focus of an individual's professional, educational experience and weighing it against hiring manager expectations. Such individualized mitigation research incorporates another dimension, which are the respective individual's actual barriers or assets in their job search.  Are they or are not they "hirable" and why?

While vocational testing is usually not as relevant for a person with an established career and employment background, if such testing would be helpful or needed (such as a disability situation in which a person cannot return to their former occupational areas), it can easily be arranged through a properly certified professional.

Exhibit 3

**Rule 26 Case List for Rhoma Young 2018**

While I have been involved as an expert witness in a broad series of cases for both plaintiff and defendant, the following situations are those in which I have been deposed and/or testified as an HR expert in trial/arbitration in the last four years.

Lassiter v AHS. Defense represented by Andrea Carlise and Hanson Bridgett. Issues were race and gender discrimination, performance management, dress, code, quality of investigation and mitigation of damages/quality of job search. Deposed early 2018.

Moussouris v Microsoft. Defense represented by Jessica Perry. Issues are gender, quality of investigation, equity in pay and promotion. Rebuttal HR expert deposed in Spring 2018.

Sarkasian v. USC. Defense represented by Michael Williams at Quinn Emanuel. Issues are disability discrimination, wrongful termination, retaliation, performance management, interactive process and accommodation and investigation. Rebuttal HR expert. Deposed January 2018.

English v. Estes Freight. Defense represented by Poyner and Spruill. Issues are performance management, wrongful termination, discrimination on the basis of age and race. Rebuttal HR expert. Deposed August, 2017.

Edwards v. AC Transit. Defense represented by Tammy Brown at Foster Law. Issues were race, lack of promotion, retaliation, discrimination. Rebuttal HR expert. Deposed June 2017.

Castillo v Safelite. Plaintiff represented by Jinny Kim of Legal Aid at Work. Issues are retaliation, harassment, quality of investigation, associated disability, performance management, failure to prevent, HR policies and wrongful termination. Deposed May of 2017. Case settled.

Rotz v. Symetra.  Plaintiff represented by Steve Murphy and Ron Spector. Issues are retaliation, age and gender discrimination, quality of investigation, policies and performance management.  Deposed October, 2016.  Case settled.

Sargent v. Cal State Sonoma  Defense represented by Durie Tangri. Issues are retaliation, whistleblower retaliation, constructive discharge, performance management and quality of investigation.  Deposed October, 2016.  Testified in trial February 2017.

Teasley v SpaceX.  Defense represented by Orrick Herrington and Fox Rothschild.  Issues are gender and disability discrimination, retaliation, the interactive process, consideration for accommodation, pay administration, the quality and need for an investigation, performance management and accountability.  Deposed October, 2016.  Testified in trial October, 2016. Defense verdict.

Lannear v Diamond Pet Foods.  Plaintiff represented by Bryan McCormack. Issues were racial harassment, performance management, prevention efforts and considerations, HR policies and procedures. Deposed June, 2016.

Magdaleno v. Ronpak.  Defense represented by Keller Sloan.  Issues are wrongful termination, ethnic origin, race discrimination, harassment, hostile work environment, performance management and employee and managerial accountability and the need for and quality of investigation. Deposed April 2016.  Defense verdict.

Smith v. Northrop Grumman.  Defense represented by Michael Hoffman. Issues are disability consideration, the interactive process,  LOA, failure to prevent discrimination and retaliation, alternative job search efforts and response to other expert witness.  Deposed March 2016.  Case settled.

Evans v Poms Insurance.  Plaintiff represented by  Pillsbury Coleman. Issues are HR policies and practices in benefit coverage when an employee died while on LOA and insurance coverages transitioned from one company to another.  Deposed March 2016.  Case settled.

Avalos v Redwood Hill Farm.  Plaintiff represented by Judy McCann. Issues are communication in the interactive process, exploration of accommodation, wrongful termination, failure to prevent and mitigation of damages.  Deposed November 2015 and April, 2016. Case settled.

Mauldin v. ISS/VSS.  Defense represented by Barbara Cotter.  Issues are RIF selection process, recall and  RTW, race, age, disability, LOA and RTW, need for and quality of investigation and efforts to prevent discrimination, harassment and retaliation.  Deposed September, 2015. Testified in Arbitration in November, 2015.

Metzner v. Kaiser.  Defense represented by Curley Hessinger.  Issues are disability, LOA, RTW, retaliation, performance management and accountability, wrongful termination and quality of job search, efforts to mitigate and recent and projected job market information. Depo September, 2015. Testified in trial November 2015. Plaintiff verdict.

Thompson v. Kirby.  Defense represented by David Frye et al, of Lathrop and Gage.  Issues are sexual harassment, sexual assault, efforts to prevent, retaliation, complaint procedure, independent contractor v. employee status and usual HR practices, performance management, accountability and rebuttal to plaintiff HR expert. Deposition August, 2015. Case settled in January, 2016.

Bustos v. Global plastics.  Plaintiff represented by Joe Beccera. Allegations include disability, use of LOA, FMLA/CFRA coverages, HR policies and practices, return to work, interactive process and accommodation, retaliation, RIF processes, performance management and wrongful termination.  Deposed April 2015.  Case settled.

Baker v. VSS.  Retained by Laura Mc Hugh of Rediger McHugh. Allegations of race, age, and gender discrimination and harassment, wrongful termination, investigation, performance management and prevention of discrimination.  Also opined on mitigation of damages.

Deposed April, 2015. Testified in arbitration, which was concluded in a defense finding.

Hurley v. California Dept of Parks and Recreation. Retained by Sedgwick (representing single defendant). Issues are quality of investigation, reliability of investigation, gender orientation, retaliation, discrimination, failure to prevent, hostile environment, harassment and performance management. Deposed February, 2015.

Pao v. Kleiner Perkins. Defense represented by Lynne Hermle, et al at Orrick. Issues are discrimination, gender, wrongful term, company response to complaint, quality of investigation, retaliation, failure to prevent, performance management and broad based HR policies, practices and procedures. Deposed Feb, 2015. Testified in trial in March 2015. Defense verdict.

Johnson v Sutter Health. Defense represented by Hanson Bridgett. Issues were mitigation of damages, quality, scope, depth and reasonableness of job search efforts, availability of comparable jobs, anticipated period of time in which to find a job and estimated potential income. Deposed May, 2014. Case settled.

Maloco v Prometrics. Defense represented by Allen Matkins and plaintiff by Chris Dolan. Issues included disability accommodation, interactive process, LOA, performance management, wrongful termination and retaliation. Deposed early 2014. Case settled.

Tina Brown Pruitt v. Oakland Arena Joint Venture-SMG. Plaintiff represented by Jocelyn Burton. Issues are policies and practices impacting wrongful termination, performance management, considerations of accommodation, the interactive accommodation discussion/process, LOAs, the organization’s response to employee complaints of discrimination, retaliation and harassment, failure to prevent discrimination, management training and quality of the investigation. Deposed January, 2014. Case settled

Exhibit 4

| Jelin v San Ramon Valley USD<br>Documents List – 06/30/18 | | |
|---|---|---|
| | | |
| **Depositions** | **#Pages** | **Approx Date Recd** |
| | | |
| Grim, Donna | 52 | |
| Jelin, Barbara | 215 | |
| Jelin, Barbara | Videotaped CD | |
| Katzburg, Amy | 109 | |
| Krsek, Laurel | 37 | |
| Kwock, Doris | 45 | |
| Larsh-Faraghan, Skye | 29 | |
| Lashin, Deanne | 53 | |
| Silva, Angelina | 31 | |
| Utler, Melanie Jones | 119 | |
| Wells, Shawn | 149 | |
| | | |
| | | |
| **Declarations** | | |
| | | |
| Utler, Melanie Jones | | |
| Jelin, Barbara | | |
| Rogers, Richard | | |
| | | |
| | | |
| **Other Documents** | | |
| | | |
| 2005-2008 Bargaining Agreement between the District and SRVEA | | |
| 2008-2011 Bargaining Agreement between the District and SRVEA | | |
| 2012-2015 Bargaining Agreement between the District and SRVEA | | |
| 2016-2019 Bargaining Agreement between the District and SRVEA | | |
| Accommodation listing | | |
| Board Policies / Administrative Rules: Complaints Concerning School Personnel | | |
| Board Policies / Administrative Rules: Complaints Concerning Discrimination in Employment | | |
| Board Policies / Administrative Rules: Dismissal / Suspension / Disciplinary Action | | |
| Board Policies / Administrative Rules: Employee Use of Technology | | |
| Board Policies / Administrative Rules: Ergonomics | | |
| Board Policies / Administrative Rules: FMLA | | |
| Board Policies / Administrative Rules: in District Programs and Activities | | |
| Board Policies / Administrative Rules: Industrial Accident / Illness Leave | | |
| Board Policies / Administrative Rules: Leave and Vacation | | |

| Board Policies / Administrative Rules: Nondiscrimination / Harassment / Anti-Bullying |
|---|
| Board Policies / Administrative Rules: Nondiscrimination in Employment |
| Board Policies / Administrative Rules: Professional Standards |
| Board Policies / Administrative Rules: Reasonable Accommodation |
| Board Policies / Administrative Rules: Special Education Staff |
| Board Policies / Administrative Rules: Uniform Complaint Procedures |
| Certificated Personnel Handbook |
| Claim for Damages Against Public Entity |
| Complaint |
| Computer Reasonable Accommodations Documents |
| Defendant's Notice of MSJ; Memo of P&A |
| Defendant's Reply to Plaintiff's Opposition to MSJ |
| District's Medical Records – File of Plaintiff |
| Employee Handbook |
| EEOC Charge |
| EEOC Intake Questionnaire |
| EEOC Guidelines ADA and reasonable Accommodation enforcement guidance |
| Ergonomic Documents |
| Job Description: School Psychologist |
| Plaintiff's Disclosure of Expert Witness |
| Interview notes |
| Plaintiff's Opposition to MSJ |
| Response to Interrogatories |
| School Psychologist Assignment Calendars: 2013-14, 2014-15, 2016-17, 2017-18 |
| Stipulation to Continue Deadline for Expert Disclosures and Discovery |
| Staff assignment information |
| Supplemental Response to Interrogatories |
| Technical Support Summary – Aug 2016; Mar 2017 – Aug 4, 2016 – May 11, 2017 |
| Work Status Reports/Medical reports |

Exhibit 5

Interview with Keith Rogenski in June, 2018

I interviewed Keith Rogenski of the San Ramon Valley Unified School District on June 21, 2018. Given that he was not deposed, I wanted to get some general background on the School District and an additional perspective on the issues dealing with Ms. Jelin. Mr. Rogenski appears to be a very qualified and experienced education and HR professional. He has responsibility for the Human Resources function for the District. He stated that the District has approximately 3,200 full time equivalent staff (FTE), and approximately 32,000 students. He has been the HR administrator in the school district for about the last three years.

He discussed the economy and budget. He said that while they have a very restrained budget, and are not a "wealthy district", that that does not stop them from being able to finance realistic and reasonable assistive devices, equipment and services for accommodation purposes. They do not have a separate accommodation fund, but he screens, reviews and will authorize the expenditure of any funds deemed reasonable and necessary for the purchase of assistive equipment or other resources to enable a disabled person to work in the District. They have to be very careful in how they spend their money, as they are accountable to the public, and they have more needs than they are able to fulfill.

In discussing the supervision of Ms. Jelin, it was described that all of the psychologists report to the principal of the school in which they are working, as their primary manager, on a day-to-day basis. Ms. Jelin, he said, could be difficult, because she does not seem to be satisfied or pleased with what is occurring.

She seems to have an ongoing series of complaints, rather than suggestions. He said a staff has taken a lot of time and energy to try and meet her requests and needs.

He sees it as a question of reasonableness. Her ongoing complaints do not all fit into the "reasonable" category. She wants to work a shorter day than may be needed to perform the job. She characterizes much of the ergonomic equipment that is purchased is "not working for her". She seems to feel the guidance and requests received from her principal as being harassing. Also, Mr. Rogenski went on to talk about how Ms. Jelin sometimes speaks circuitously and can be hard to follow, which makes trying to work with her to be exacting (in identifying her actual needs).

He was asked about her grievances, and he said that he knew she had filed four to five grievances about three years ago, and they were denied by the HR department at the first step and the Union did not carry them forward.

He said that in October of 2017, she filed a new charge of discrimination based upon how the previous situation had been handled.

We discussed the interactive process (IA), and he described himself as being pretty experienced in having held IA meetings, coached others on holding meetings, worked with the principals, and has done training. They did a specific ADA training for all managers, that was mandatory. This was done in November of 2017. They had their employment lawyer and insurance person come in and participate and also act as resources in the training. They showed case study examples of types of interactive meetings that were good and that were not so good. They discussed the differences.

When asked about the impact of Ms. Jelin's requests on the District, other than economic, he said that the staff time that has taken to try and meet her demands is very high. It has increased, because "it does not work" for her . He said that they have given her more tech help in the period of time he has been there than for any other single person. The have given her ongoing support.

Her current school principals are very experienced, and they will hold her accountable for her job assignments and her job performance. Assignments for school psychologists locations are centralized, and based upon a combination of staff needs and staff availability. Those decisions are usually made by the Special Ed Department, and they do give employees an opportunity in January or February of each year, to comment on their current assignments, or request any changes.

He said that at one point, Ms. Jelin seemed to be having difficulty with her principal with whom she had worked for a number of years. They offered her a chance to transfer. She did not take them up on that offer.

Mr. Rogenski said that the organization is very responsive to ADA issues. They do not always meet every request (in the exact same way) that an employee makes, but they respond to all issues. They don't let things sit around without paying attention to them. He said that sometimes they provide an alternative accommodation to that that has been the specifically requested by an employee. They try to meet and balance organizational needs, economic impact, but mostly the effectiveness of working staff and teachers with the students. He said that that drives everything.

He described his current HR staff as being extremely responsive, willing and committed. He said that he is so proud of their teamwork, their commitment. They all work together very, very well. He has a staff of approximately 21 HR people in the organization. He said that they are skilled, and customer service oriented. They are smart, fun and a great team.

When describing Ms. Jelin, he said that she does not seem to be able to work on problem resolution, but ends up in conflict. He said the District has truly tried with staff, technology, support and ongoing communication. With her, it seems that partnership aspect of the interactive process is not very working well. She determines what she wants and asks how she is going to get it. Recently, in the past few weeks, he signed off on another request for equipment that she wanted to go outside and purchase. He

said that there were several technical devices at Best Buy, and he signed off on approving reimbursement for her for her funds.

The efforts of the School District staff do not seem to be sufficient for Ms. Jelin. He said that it is frustrating, because they try really hard and they really want to have people with a disability be able to be accommodated so that they can continue to do their work and work safely and effectively with students. He said that is what this process is all about. He said that, so far,  that does not seem to be working with Ms. Jelin.

**Exhibit 6**

**Jelin V San Ramon Valley School District.**

Depo Excerpts – Katzburg Depo – page and line citation. Sorted by specific categories.

OVERVIEW

1. We have a large district. We have 36 schools. The vice president and myself divide the schools… – Katzburg Depo – p 13. 7-8

2. I think there's been ongoing issues that have come to the workplace for Barbara, so she's been needing support throughout the time that I've known her. Q. Has any of your union reps ever complained to you about difficulties in working with Ms. Jelin? A. Yes. – Katzburg Depo – p 17. 13-18

3. It's been challenging. Barbara has many issues beyond, you now, the physical. It's meeting the needs of her assignments. There's been delays in her reports. And that she does send us lengthy emails and discusses the amount of time that she needs to do her job, but I would imagine we've discussed the fact that the emails themselves probably take a lot of time, too. – Katzburg Depo – p 56. 3-9

4. A … when we assign our sites their positions for the following year, we want to make sure that everybody is taken care of, and I was concerned about Barbara's position and I didn't want her working at multiple sites. – Katzburg Depo – p 58. 2-5

WORKLOAD

1. Mr. Ly: Q. Do you know how long Ms. Jelin was supposed to work in a typical workday? A. I'm going to answer this from my own experience. I am a classroom teacher. I know that the seven-hour workday is not enough. It's not enough time to do the work that we have to do. And our employees work beyond the seven-hour workday in order to fulfill the expectations of their jobs. – Katzburg Depo – p 26. 22-25; p 27. 1-4

2. Q. … Ms. Jelin's workload is on average with other school psychologists at the district? A. Yes. – Katzburg Depo – p 50. 7-9

3. The Witness: … Barbara is that working at a cold if sites has provided a number of challenges for her, and in order to reduce the workload, the district really wanted to try to keep her at one site, which she was at Bollinger Canyon. And that was her only site for, I believe, a year, maybe two years…But many of our psychologists do have to work at multiple sites because of the nature of the job…We are spread thin. – Katzburg Depo – p 50. 14-23

4. Mr. Ly: Q. …how many assessments Ms. Jelin has to do in a given school year? … A. I would estimate that it could be anywhere from 30 to 50. Q. Assessments in a given school year? A. Correct. Q. Is that about average for other school psychologists you have represented? – Katzburg Depo – p 51. 4-5; 10-15

5. … Melanie said that in order to receive payment for the hours, you need to ask prior to doing the work. …. Melanie said that psychologists in the district all have to do work that goes beyond the workday and she couldn't make a separate allowance for Barbara … – Katzburg Depo – p 65. 12-17

6. A … "Barbara is not comfortable with this method as the information includes other reports and her understanding is that when she's assigned to a caseload, Melanie said it's the same expectations for her as with everyone." – Katzburg Depo – p 77. 13-17

7. Barbara is not comfortable with this method of the collaboration because of the information from the other reports. … she would rather do her reports separate from the other reports. – Katzburg Depo – p 78. 1-3; 4-6

8. Melanie said that it's the expectations for her to work with everyone and to have the reports done. Q. Did Shawn say that she would pay for extra hours? … A. Yes. – Katzburg Depo – p 78. 8-10; 13

9. Q. So somebody told you or you concluded "the district is so upset"? A. Melanie probably told me that. – Katzburg Depo – p 81. 11-13

10. Q. May 5th, 2016 notes. … A. During the time that Barbara was out, the team did not expect her to make upon those assessments that were assigned during the time she was absent. – Katzburg Depo – p 86. 23; p 87. 21-23

11. … emails there's a lot of things that are compounding on this issue in addition to the technology. … Barbara comes back to work and attempts to comb thorough emails, she won't be able to do anything else, whether or not her computer is working, because there's so many. – Katzburg Depo – p 91. 5-6; 10-13

12. … Melanie is saying to her that's your job responsibility to get through emails, that would be … when she's working, if somebody is emailing her currently, it's an expectation that we get – as an employee of the district, that we get through those emails Communication is important, so if Barbara is getting information and not looking at the emails and not understanding what the next steps are, that could be problematic. – Katzburg Depo – p 91. 14-23

13. The Witness: I have heard that Barbara has a hard time getting her work done because her reports are lengthy. – Katzburg Depo – p 101. 15-17

<u>ACCOUNTABILITY</u>

1. … when our administrators evaluate our members, they go through a series of observations, and we have really clear guidelines on what are the necessary steps to take to complete an evaluation. – Katzburg Depo – p 30. 19-22

2. … she had done an evaluation on Barbara where she marked her off as unsatisfactory, and that was just last year; however, she was supposed to have three observations in order to arrive to that unsatisfactory marking, and she had only done – Shawn had only done two observations. – Katzburg Depo – p 31. 5-10

CHALLENGES

1. It's hard when we are working with Barbara, because she tends to bring in a lot of different factors rather than just sticking to the main thing that she's trying to achieve, and I think that gets confusing. – Katzburg Depo – p 20. 2-6
2. …it's really important that we try to support her by reigning her ideas into focus. – Katzburg Depo – p 20. 7-8

3. Q. Has Mr. Spotts ever communicated that Ms. Jelin was unreasonable in her demand or her viewpoints or anything along those lines? A. Yes. – Katzburg Depo – p 22. 11-14

4. A … Linda has represented Barbara more than any of us, because she has been at that school site, and she's done a really great job. She said that the difficulty is something that I stated earlier, it it's difficult to keep Barbara focused onto the issues at hand. And so, Barbara has been – has expressed many, many issues. It's been a plethora of concerns. So Linda has helped Barbara kind of gather in the information so that it's been easier to understand – Katzburg Depo – p 27. 11-19

5. Mr. Ly: Q. … has anyone ever expressed to you that they just would rather not work with Ms. Jelin for any reason whatsoever? … The Witness: Yes. – Katzburg Depo – p 104. 15-17; 19

6. A … two weeks ago. A. She was expressing some concerns about one of her students and she said that it's been a really difficult year, it's been an extremely difficult class and the student has a lot of needs. And I asked her if she talked to Barbara and she said that she had, but she hadn't gotten any results that she thought were helpful and that it was frustrating for her. Q. Did you have that understanding of what she meant by results that were not helpful? A. She said that she felt that Barbara was not organized. – Katzburg Depo – p 105. 10; 12-22

7. Mr. Ly: Q. … did you state that one of the noes state that Ms. Jelin didn't follow a computer directive? A. Yes. … A. So Laurel had directed Barbara not to work with people outside of the district. And when the computer malfunctioned and

Barbara wasn't able to utilize it, she called somebody else out of the district. – Katzburg Depo – p 106. 23-25; p. 107. 1; 6-9

ROLE

1. Because I'm the president, I take my duty of representation seriously, and all of my members I represent in a variety of capacities. – Katzburg Depo – p 13. 2-4

2. … When there is a lot of representation for a particular member, what ends up happening is that, as members, we try really hard to make sure that we're there to represent, and our role primarily is not to speak on behalf of the member – the member does that – but to take a lot of notes. And so, when there's multiple meetings, I Mean, it is time-consuming. Our members are – our reps are happy to do it, but it is time-consuming. – Katzburg Depo – p 18. 2-9

3. Q. … Larry Spotts, you said he was your CTA staff. But did he ever represent Ms. Jelin. A. He has. Qu. Do you know what time period he's represented Ms. Jelin? A. He's been here starting his third year. So throughout that time, he supports me in representing members. And when it comes to accommodation, he has an expertise on that, so I've asked him for some consultation, as well as, I believe he has represented her, too with administration. – Katzburg Depo – p 18. 16-17; p 19. 1

4. A … he has a knowledge bank that's quite deep because he's represented thousands of members and he has worked on many, many cases of accommodations. – Katzburg Depo – p 19. 4-7

STAFF

1. Q. … who Shawn Wells is? A. She's the administrator principal at Bollinger Canyon Elementary School. – Katzburg Depo – p 30. 3; 6-7

2. My opinion of Shawn is that she isn't the most careful administrator and has made errors. – Katzburg Depo – p 30. 11-12

3. … is that she doesn't communicate real clearly. – Katzburg Depo – p 30. 15-16

4. Mr. Ly: Q. What is your opinion of HR director Melanie Jones? The Witness: I've worked a great deal with Melanie Jones. I find Melanie Jones to be extremely trustworthy. I have a lot of respect for her because, her and I may differ in opinions, but we are always able to talk through things, and when I've discussed cases with her, I know that she will listen, and if we disagree, we can take things to the next step, but there's no emotional attachment there as far as me feeling any disrespect towards, her. I know that we're both doing our jobs. I think that she's been a really good director for our district. – Katzburg Depo – p 33. 1-11

5. A ... have had multiple discussions with Mrs. Jones … Barbara has brought forward a number of concerns that Mrs. Jones has spoken to me about… – Katzburg Depo – p 55. 21; 23-25

6. A … Ms. Jones responded in that she wants to make sure that Barbara has as minimal amount of stress as possible. – Katzburg Depo – p58. 12-14

7. Q. Melanie asked what happed to the original keyboard? … A. … Shawn was explaining that she went to Fry's to pick it up. She was – oh, she said that she was ordering a new keyboard for her and Shawn said she would call Fry's and she would go and pick it up herself. – Katzburg Depo – p 600. 19-20; 23-25; p. 61. 1

8. A. … do I recall if Shawn Wells was implying that she wanted to get rid of Barbara? No, I don't remember a conversation like that. Q. Based on her actions, did it occur to you that Shawn Wells was trying to get rid of Ms. Jelin? ... The Witness: I never felt that. – Katzburg Depo – p 70. 19-24; p 71. 1

9. … "Shawn thanked Barbara for having the assessments done, and there are multidisciplinary reports." Multidisciplinary report is something that involves the other special educator's reports as well. So they work in collaboration. – Katzburg Depo – p77. 21-25

10. Q. Did Melanie say "No one else on the planet has these same problems"? A. No. That was probably me. Q. Did Melanie tell you that they were "going to deliver her a directive tomorrow that she can only have one computer, and that only district technicians can work on it and she is not to call anyone else"? A. Yes. – Katzburg Depo – p 81. 17-24

<u>INJURIES & HEALTH</u>

1. Q. Did Ms. Jones state why they were asking Ms. Jelin to take another leave of absence? A. Because she had reinjured herself. – Katzburg Depo – p 34. 18-20

2. Q. … Ms. Jones stated that she had to put Ms. Jelin out on leave, did she state it in a rude manner? A. Not that I recall. Q. Was it professional? A. Yes. – Katzburg Depo – p 36. 5-9

3. A Ms. Jelin was very upset…she felt that she could continue to work. – Katzburg Depo – p 36. 24-25; p 37. 1

4. Q. Did she state why she felt she could continue to work? A. Because she had been, and the problem that Ms. Jelin was going to experience by being out of work is that the workload would continue to compound and the replacement psychologist wouldn't do the job – wouldn't do the job as Barbara would because

she didn't know the students as well. Barbara had developed those relationships already with the students. – Katzburg Depo – p 37. 2-10

5. A. She explained that she wanted to keep Barbara safe and not further injure herself. – Katzburg Depo – p 39. 6-7

6. The Witness: Ms. Jones did not state that the 11/6/15 injury occurred because accommodations were not in place. She didn't say that. Mr. Ly: Q. Do you have understanding of what the 11/6.2015 injury is? ... A… it was caused because Barbara picked up a stack of papers and got her thumb stuck on the wire, and she was not supposed to be picking up things that were heavy. I think it was caused not because the paper was heavy, but it was caused because of an accident. Q. our understanding of the wire getting caught on her thumb is based on Ms. Jelin's testimony to you… – Katzburg Depo – p 40. 14-18; 22-25; p. 41. 1-3

7. A … the doctor's report, there were limitations on how much she could carry, and it differed for each of her hands. And one hand, I think, there was hardly any weight that she could pick up anything so both of her hands had restrictions. – Katzburg Depo – p 41. 11-15

8. So with one hand, I remember there was one pound, so hardly anything. I think the other one was about five pounds. – Katzburg Depo – p 41. 20-22

9. A ... Work restrictions for Barbara said she wasn't to use her left hand and she wasn't to lift with her left hand and she was to use voice dictation and she was to work eight hours per day and she was on temporary disability. – Katzburg Depo – p 61. 4-8

<u>TECHNOLOGY</u>

1. A … I wanted to know how long do we fool around with the computer issue, because Barbara had been given a directive, hadn't followed the directive and I wanted to find out what was going to happen to her. – Katzburg Depo – p 84 17-20

2. I believe that she was given permission to buy a computer from CJ, so prior to Melanie ones, and that she was reimbursed. Or maybe he bought it. Sorry; I don't know. Q. Do you remember that she was reimbursed a year later? A. I think it was delayed. – Katzburg Depo – p 86. 9-15

3. The Witness: … there definitely were complications with the technology. And I remember working with Barbara on several occasions where she had difficulties with the computers and it was a source of frustration. – Katzburg Depo – p89. 21-25

4. A … I've known Barbara for quite some time and have been involved with her in a leader capacity for maybe six, seven, eight years. …my understanding is that there were times when the computer was a source of frustrations. – Katzburg Depo – p 90. 8-10; 12-14

5. … Barbara believes that the district hasn't done enough to support her with the technology because there's been multiple issues with technology and there's been principals that have demanded excessive work that she can't fulfill. – Katzburg Depo – p 43. 6-10

6. … Barbara has had multiple issues with the technology and has tried to problem solve outside of the district. And my understanding is that our server and the outside support – or district server and the outside support aren't communicating, so that's caused further problems, and it could go on and on, but there's been multiple issues with technology. – Katzburg Depo – p 45. 15-21

7. The Witness: I believe that they have done a lot to support Barbara with the technology. Mr. Ly: Q. What do you mean by "a lot"? A. So they have met with Barbara. They have provided Barbara with the software. They have bought Barbara a computer to go along with the software. They have sent people to work with her and support her throughout this time period so that she can do her job. – Katzburg Depo – p 47. 7-14

IAP

1. Mr. Rogers: Q. The next set of notes are dated April 19, 2016, in Exhibit 4. A. Got it. … Q. … Barbara met with Melanie and Keith to discuss accommodations. And then it says that Barbara met with Shawn, Melanie and Doris to discuss ADA transition. – Katzburg Depo – p 71. 2-4; 14-16

2. A. ... Larry Spotts and I were both representing Barbara, and I asked him if he would be willing to represent her because he's better at the ADA than I am. And with the level of complexities, I felt that he – if he was willing to be there, it would probably be better. – Katzburg Depo – p 83. 5-9

3. Q. …. August 12, 2016, I believe. … The Witness: "Keith, I met with Barbara Jelin at 1:00 this afternoon to review technology. Shawn Wells and Ann Katzburg also attended the meeting." – Katzburg Depo – p 83. 10-11; p 85. 16-18

Exhibit 7

School Psychologist Evaluation…Ms. Jelin's *Performance review 2018*

Assessment Rubric – Evidence

Barbara's professional goal was to research and pilot the ChAMP assessment tool. The purpose was to reduce testing time for students however in her reflection, Barbara shared that she gave an additional assessment tool which would not have decreased any testing time.

Several attendees at IEP meetings have shared with admin team that Barbara's presentation of her reports is difficult to follow and jumps around from section to section.

- Evaluation Rubrics – PILOT – 04/25/18

Consultation Rubric – Evidence

- Barbara does not consistently respond to emails in a timely manner.
- Barbara has spoken to coworkers and administrators in a disrespectful or sarcastic tone. … She also asked for extra paid hours in order to complete tasks that are already a part of her job description.
- Barbara has had difficulty working collaboratively with the SPED team. We have provided additional support for the SPED team by having District and SRVEA leadership joining team meetings.

Comments: To move from emerging to proficiency, Barbara can:

- Respond to emails within 24 hours
- Communicate and collaborate with IEP teams
- Be open to differing points of view and engage in respectful dialogue
- Listen while other are speaking
- Complete reports in a timely manner

- Evaluation Rubrics – PILOT – 04/25/18

Counseling Rubric – Evidence

Students report that Barbara is kind and enjoy going to see her.
She has made herself available on one occasion when one of her counseling students was resistant to leave the blacktop

Comments: Although evaluator has not observed counseling sessions, classroom teachers have reported inconsistencies in communication, recommendations and practice when working with Barbara.

- Evaluation Rubrics – PILOT – 04/25/18

Developing as a Professional Educator Rubric – Evidence

Barbara has required extra time to complete reports and has worked with the team to decide on an appropriate format to store the reports.

Comments: This has been an area of concern all year. Barbara has not been open to feedback in this area and typically deflects responsibility onto other team members.

To move from emerging to proficiency Barbara can:

- Be open to feedback/suggestions regarding professional growth.
- Manage time efficiently such that professional responsibilities are completed within allotted time limits.

- Evaluation Rubrics – PILOT – 04/25/18

Summary

Strengths:

- Builds rapport with parents at beginning of IEP meeting
- Students report that Barbara is supportive
- Maintains confidentiality

Recommendations:

- Maintain a professional and sensitive demeanor when supporting families during IEP meetings.
- Work on conflict resolution skills to facilitate teamwork to determine how to resolve conflicts and come to agreements.
- Attend conflict resolution training as determined by district leadership.
- Barbara will be a collaborative and cooperative member of the special ed team.

- Evaluation Rubrics – PILOT – 04/25/18

Date of Final Evaluation Meeting: Wednesday, April 25, 2018

Unsatisfactory – Evidence:

- Barbara has spoken to coworkers and administrators in a disrespectful or sarcastic tone.

- o Barbara has had difficulty working collaboratively with the SPED team. We have provided additional support for the SPED team by having District and SRVEA leadership joining team meetings.
- o Collaborative reports are not completed in a timely manner, providing families with sufficient time to review the report before the IEP meeting… However, most families have received their reports 24 hours in advance of the meeting.

– Evaluation Rubrics – PILOT – 04/25/18

Ms. Jelin's Response to Evaluation Rubrics when signing (dated 04/25/18)

"I am not in agreement with this evaluation. Misleading: and or factually inaccurate information." – Evaluation Rubrics / Assessment Rubic PILOT – 04/25/18

**<u>Exhibit 8</u>**

**Jelin V San Ramon Valley School District**

**Chronology/Sequence – AS OF JUNE 24, 2018**

This is not designed as an all encompassing, comprehensive document to mention every incident of importance. Rather, it is designed to portray a *sequence* of events to provide a context to view similarities and differences as things change, evolve or stay the same in the communications between and among staff, the plaintiff, health care providers and support providers. Items were selected from different sources. There are some situations where the same incident may be mentioned more than one time, but viewed from different or conflicting perspectives. That is purposeful. *Representative* information about physical/health status reports are included…not all. This was to outline shifts in restrictions. The yellow highlights point out some key items that can either echo and confirm each other or stand out in contrast.

Source Documents (dates: highlighted / pages turned down / highlight into the margin): Personnel/Payroll records (2 different batches); Defendants MSJ/P&A; Complaint; Declaration Melanie Jones Utler; Barbara Jelin Depo; Barbara Jelin Declaration Exhibits

| | |
|---|---|
| August 2006 | Ms. Jelin hired by San Ramon Valley Unified School District as a School Psychologist. – Complaint p 2. 3 |
| 2006 | Ms. Jelin's employment at San Ramon Valley Unified School District as a School Psychologist begins. – Defendant's MSJ p 1. 18-19 |
| 2006 – 2009 | Ms. Jelin claims she was not assigned a heavy workload. – Defendant's MSJ p 3. 8-9 |
| 11/16/2006 | Injury – Bilateral carpal tunnel; bilateral wrists, significant impacted use of palms and fingers. – Jelin Depo p 2. 8-10 |
| November 2006 | Ms. Jelin has disabilities in her upper extremities as a result of an industrial injury. – Complaint p 2 4-5 |
| November 2006 | Ms. Jelin claims she "has disabilities in her upper extremities as a result of an industrial injury in November, 2006 [sic]." – Defendant's MSJ p 2. 17-8 |
| 2007 – 05/22/18 | Ms. Jelin claims that ergonomic set up and the voice dictation program were not accommodated. – Defendant's MSJ p 5. 2-3 |
| 2007 | Ms. Jelin argues that the assignment of the heavy workload is motivated by her disability because Joanne Biondi wished her good luck in a laughing tone. – Defendant's MSJ p 3. 10-12 |
| August 2007 | Injury – One wrist bend backward while moving into Cal. – Jelin Depo p 2. 11 |

| | |
|---|---|
| August 2007 | Employee states she was diagnosed in August of 2007 and chose to take care of it with her own insurance. – Personnel/Payroll records |
| 2008 | Ms. Jelin believes that the District has not been paying her full wages since 2008 and that she is owed more than $127,000 in unpaid wages. – Defendant's MSJ p 5. 11-12 |
| 06/16/2008 | Chiropractor QME Letter: "recommended to receive an ergonomic evaluation for each of the four workstations that she is scheduled to be utilizing for the 2008-2009. … performed by a certified ergonomic specialist." – Personnel/Payroll records |
| 06/18/2008 | Company Nurse On Call: Supervisor's Report of Injury: "For reporting purposes only. Employee states she was diagnosed in August of 2007 and choose [sic] to take care of it with her own insurance. Employee relocating from one school site to another. Employee requested to have an ergonomic evaluation done and was advised se needed to file report with Company Nurse and see a provider." – Personnel/Payroll records |
| 06/18/2008 | CCC Schools Insurance Group Work Evaluation Status: "Additional Restrictions – Mandatory ERGO evalu @ all workstations by certified ERGonist!!; No keyboarding/mousing > 30 min with 5 min stretch break. – Personnel/Payroll records |
| 08/21/2008 | Tri-Valley Orthopedic Specialists Work Status Report: "Continue modified duty; Limit lifting / carrying to 5 lbs; Limit repetitive fine manipulation (including keyboard, mouse, etc) to 20 minutes, then off for 5 minutes; No repetitive grasping; No pushing, pulling, overhead work." – Personnel/Payroll records |
| Sept 03, 2008 | Dr. Burgar: Primary Treating Physician's Progress Report: "…completed 5 sessions of occupational therapy with resolution of her throbbing pain, however she has developed sensitivity to the ultrasound used in therapy. She [sic] ergo eval has just been completed. – Barbara Jelin Declaration Exhibits |
| August 24, 2010 | Dr. Dolon evaluates Ms. Jelin. – Barbara Jelin Declaration Exhibits |
| 2009 – 2016 | Ms. Jelin believes the District discriminated against her by giving her a heavy workload. – Defendant's MSJ p 14. 2-3 |
| January 16, 2009 | CCC Schools Insurance Group: "…we are denying liability for your claim of injury to both of your wrists. Workers' compensation benefits are being denied because the State appointed Qualified Medical Evaluator, Dr. Van Dolson has advised that your ongoing bilateral wrist and hand complaints were not caused by the specific event occurring on August 7, 2007, but are the result of your underlying pre-existing long-term symptoms in your upper extremities…"– Personnel/Payroll records |
| May 27, 2010 | CCC Schools Insurance Group: "Please be advised that we are accepting your claim for cumulative trauma based on the QME supplemental records by Dr. Van Dolson dated 1/12/10 and 3/29/10. …benefits to which you are entitled under the Workers' |

| | |
|---|---|
| | Compensation system, as your claim has been accepted. Payments of temporary disability are made based upon a seven day week while you are unable to work because of your injury." – Personnel/Payroll records |
| 04/15/2011 | Injury – I think left ankle. – Jelin Depo p 2. 14 |
| March 01, 2012 Fri | Dannenberg email to Jelin "I have received permission from the claims manager, Jacqueline Bailey, to do this review in person or on the phone. If you prefer me to come and meet in person, I can do that. … I will have copies of the other things I emailed to you that we need to go over. Looking forward to our meeting on Friday, March 2, at 3 pm. We should finish by 4 pm. – Personnel/Payroll records |
| March 02, 2012 Fri | Jelin email to Pam Dannenberg "I have the flu and am very tired from not getting enough sleep all week due to wrist pain. I will do my best to make it through the day." – Personnel/Payroll records |
| March 19, 2012 | Jelin letter to DIR/DWC-Medical Unit: "I am writing to follow up on my phone call today requesting a different QME panel list….they don't have appointments available until July…I had not heard back from her office…I called your Medical Unit 1-800-794-6900 today on 03/19/12 and was sent around your voice messaging program for over 5 minutes before being asked to leave a message within an unknown voice mail box…I requested a different QME panel list…I would still prefer Dr. Henry and should an appointment become available with her…" – Personnel/Payroll records |
| 08/31/2012 | Injury - … bruises and contusions; strain/sprain; exacerbated bilateral wrists and upper extremity injuries; right hip; left knee/ankle rolled out. – Jelin Depo p 2. 15-17 |
| August 31, 2012 | Dr. Devor AME Letter 12/14/16: "Ms. Jelin was attacked by a 10-year old child at work. – Barbara Jelin Declaration Exhibits |
| September 4, 2012 | Injury Report Company Nurse "Bruises, contusions, and other blunt injuries. Pain scratches, bleeding stopped / bruising to both arms. Pain to both legs and left ankle. JONMIR Employee states having pain in her neck, right pinky finger is swollen, and pain in left knee and ankle. 'How did the accident happen?' Barbara was blocking the door to keep a student from leaving when he grabbed both arms and kicked both legs. 'Please specify machine, tool, substance or object most closely connected with this accident.' A student. Caller disconnected before chart pulled up. Call returned and person answering said that pt. held the line and hung up. She went to ask her to come to the line and pt. according to person answering call, states she "is in a meeting" and 'unavailable." … CLAJAN Attempted to each caller at supervisors number and got message that this person does not have a voice mail 08/31/2012. NOEMAR attempted to return call at patient's home and left generic message to return my call. NOEMAR called home number Answering machine reached. Message left. … Employee states |

| | |
|---|---|
| | that she had two voice messages left on her phone and is not sure what to do because she is still having knee and ankle pain. …" – Personnel/Payroll records |
| October 5, 2012 | Email from Rick Caldera to Barbara Jelin "It appears that we should meet one more time…" |
| October 8, 2012 | Work Status Muir/Diablo Occupational Medicine "Work Status Regular Work effective 09/24/12 to Recheck. Patient Discharged / Permanente & Stationary. Patient at pre-injury status: NO. Permanent disability expected: YES." – Personnel/Payroll records |
| October 8, 2012 | Work Status Muir/Diablo Occupational Medicine "Therapy Location: Tice Valley PT and Sports Medicine. Type: PT. Rx: 2 times/week for 3 weeks." – Personnel/Payroll records |
| 2013 – 2014 | Ms. Jelin indicate that Shawn Wells, Donna Grim and Doris Kwok directed her not to provide "legally mandated services" (the designated instructional services a student is qualified to receive as part of their Individual Education Plan (IEP)). – Defendant's MSJ p 6. 4-7 |
| 2013 – 2014 | Ms. Jelin believes the District assigned her a heavy workload based on her disability based on conversations with Shirley Converse. – Defendant's MSJ p 3. 14-15 |
| Sept 26, 2013 | Email from Cammack to Eggleston/Jelin Re: … "the meeting for September 26, 2013, which was scheduled for you to meet with your Principal, has been cancelled…" |
| October 4, 2013 | Interactive Meeting: Jelin, Venterino, Eggleston, Cammack, Rowley-Thom – SRVUSD Letter 10/15/13 |
| October 13, 2013 | Letter Summarizing 10/4/13 Interactive Meeting – SRVUSD Letter |
| October 18, 2013 | Letter from Janis E. Eggleston, Esq: Response to Summary of Interactive Meeting – 10/4/13 |
| 12/1/2013 | CCC Schools Insurance Group Letter: Date of Injury: 08/01/2007. "If you are represented, and no comprehensive medical evaluation has taken place you may obtain an evaluation by an Agreed Medical Evaluator. If no agreement can be reached, you may be evaluated by a Qualified Medical Evaluator obtained from a panel issued by the DWC Medical Unit." – Personnel/Payroll records |
| Dec 3, 2013 | SRVUSD Letter to Eggleston Re: Jelin: Requests for Accommodation |
| Dec 19, 2013 | Eggleston Letter to SRVUSD Responding to 12/03/13 Letter Re: Accommodation |
| 2014 – 2016 | Alleged motivating reason for allege retaliation: Speaking up for the students not receiving their legally required services; not receiving make up services. – Jelin Depo p 13. 27-28 |
| 2014 – 2015 | Ms. Jelin indicate that Skye Larsch and Karen Heilbronner directed her not to provide "legally mandated services" (the designated instructional services a student is qualified to receive as part of their Individual Education Plan (IEP)). – Defendant's MSJ p 6. 8 |

| | |
|---|---|
| January 15, 2014 | CCC Schools Insurance: "Payments are ending because you were released to return to work." – Personnel/Payroll records |
| January 17, 2014 | Dr. Lin's Disability Certificate / Work Status: "Bilateral pain, upper extremities / Temporary Total Disabled." – Personnel/Payroll records |
| January 22, 2014 | Dr. Lin's Disability Certificate / Work Status: "Bilateral wrists and neck injury. Cleared to return to modified work from 01/22/14 to 02/22/14." – Personnel/Payroll records |
| 03/03/2014 | Dr. Devor's AME report (State of California, Division of WC) Notice of Offer of Modified or Alternative Work for Injuries Occurring Between 01/01/04 – 12/31/12 inclusive: Date of Offer/Date Job Starts: 03/03/14 – A specific injury 08/01/07.<br>• "Ms. Jelin has cervical disability that precludes very heavy work and prolonged posturing of the head and neck. She requires no work restrictions for her right elbow.<br>• For her left elbow…prophylactically restricted from work that requires repetitive flexion at the left elbow beyond …<br>• Ms. Jelin should be restricted from prolonged keyboarding…She can still keyboard up to a total of four hours intermittently…restricted from repetitive strenuous gripping and grasping…To minimize problems with her right hip, Ms. Jelin needs to be restricted from repetitive stair climbing, repetitive squatting, and very heavy lifting. As long as Ms. Jelin's keyboarding can be restricted to four hours per day intermittent with other tasks, and as long as Ms. Jelin can occasionally change position and/or take a break while keyboarding to minimize prolonged posturing of her head and neck, she should still be able to perform her regular duties as a school psychologist with the San Ramon Valley unified School District. Ms. Jelin requires an ergonomically correct workstation and is probably also going to require voice-activate software for her computer work. If her duties cannot be so modified, she will be eligible for supplemental job displacement benefits. Work at home should be minimized because ergonomic factors cannot be controlled at Ms. Jelin's home." – Personnel/Payroll records |
| 06/02/2014 | CCC Schools Insurance Group Letter to Jelin: "We are in receipt of medical information from Dr. Devor's AME report dated 03/03/2014 that indicates you are medically eligible for vocational rehabilitation benefits." – Personnel/Payroll records |
| January 27, 2015 | Every alleged act of disability discrimination, failure to engage in the interactive process, failure to provide reasonable accommodation, and retaliation that occurred prior to January 27, 2015 is barred by the statute of limitations. Ms. Jelin filed a Charge of Discrimination with the EEOC – year prior is January 27, 2015. – Defendant's MSJ p 11. 8-12 |

| | |
|---|---|
| 2015 – 2016 | Ms. Jelin indicate that Shawn Wells, Doris Kwok, Melanie Jones and Cindy Leong-Perez directed her not to provide “legally mandated services” (the designated instructional services a student is qualified to receive as part of their Individual Education Plan (IEP)). – Defendant’s MSJ p 6. 9-10 |
| 2015 – 2016 | Ms. Jelin claims that Ms. Wells retaliated against her by making slanderous statements about her (Jelin) to the staff, parents, and students. – Defendant’s MSJ p 8. 17-18 |
| 2015 | Dr. Devor AME Letter 12/14/16: “Ms. Jelin notes that her right great toe has been bothering her for a few years. Finally in 2015, she underwent surgery on her right great toe.” – Barbara Jelin Declaration Exhibits |
| Spring 2015 | Verbally reprimanded for speaking up about safety concerns at an IEP. – Jelin Depo p 14. 20 |
| April 2, 2015 | Ms. Jelin’s claims prior to April 2, 2015 are time barred. – Defendant’s MSJ p 10. 1 |
| August 2015 | DFEH Charge of Discrimination 01/17/16: Jelin went on medical leave. – Barbara Jelin Declaration Exhibits |
| Aug 14-26, 2015 | Temporary Disability, weekly $1,010.50 based on $1,907.10 weekly earnings, until able to RTW or permanent and stationary. (CCC Schools Insurance Group Letter to Jelin) – Personnel/Payroll records |
| Sept 21, 2015 | Dr. Schwartz Work/Activity Status: RTW with “light/modified duty/activities 09/21-10/29, 2015, Temporarily disabled on 09/17/15. Status: Patient could potentially return to light duty modified work on September 21, 2015 with no lifting left hand, no repetitive strenuous gripping, grasping either hand, occasional reaching above shoulder level, voice dictation for reports and emails. Workday limited to 8 hours per day. If light duty modified work is unavailable, patient will need to remain on temporary disability until she is reevaluated in 6 weeks.” – Personnel/Payroll records |
| Sept 21, 2015 | DFEH Charge of Discrimination 01/17/16: Jelin released to return to work on modified duty. – Barbara Jelin Declaration Exhibits |
| October 2015 | Ms. Jelin believes the District engaged in retaliatory acts after she submitted the EEOC charge that was “stamp dated” in October 2015, resulting in the November 6, 2015 meeting. – Defendant’s MSJ p 7. 17-18 |
| October 2015 | Ms. Jelin claims that Shawn Wells retaliated against her by refusing to assist her in marking her as absent in the computer attendance system. – Defendant’s MSJ p8. 7-8 |
| October 19, 2015 | DFEH Charge of Discrimination 01/17/16: Jelin submitted to Respondent further medical documentations outlining my restrictions. – Barbara Jelin Declaration Exhibits |

| | |
|---|---|
| November 6, 2015 | Ms. Jelin admits no one at the meeting stated that they were placing her on leave to retaliate for the submission of the EEOC Form. – Defendant's MSJ p 7. 20-21 |
| November 6, 2015 | Ms. Jelin cites this meeting as an example of disability discrimination against her. She has not provided any documents supporting an EEOC charge submitted with a stamped date of October 2015. – Defendant's MSJ p 7. 21-24 |
| November 2015 | Dr. Devor AME 12/14/16 Letter: "Ms. Jelin sustained a new work-related injury. She picked up a stack of stuff and her left thumb got caught in a power cord. – Barbara Jelin Declaration Exhibits |
| 11/06/2015 | Injury – Left thumb. – Jelin Depo p 2. 18 |
| November 6, 2015 | Ms. Jelin claims she hyperextended her left thumb due to a power cord wrapping around her thumb as she was picking up documents. – Defendant's MSJ p 2. 19-20 |
| November 6, 2015 | DFEH Charge of Discrimination 01/17/16: Jelin injured on the job. – Barbara Jelin Declaration Exhibits |
| Prior to 11/13/15 | Prior to this meeting with Ms. Jelin, Melanie Jones Utler was informed by her colleague Angelina Silva that Ms. Jelin had injured her thumb. – Jones Utler MSJ p 1. 27-28 |
| Nov 13, 2015 | DFEH Charge of Discrimination 01/17/16: Jelin called in for a meeting where told she had to leave work. – Barbara Jelin Declaration Exhibits |
| Nov 13, 2015 | Ms. Jelin claims that due to the hyperextension of her left thumb on November 6, 2015 by a power cord, she was summoned to meet Director of Certificated Personnel Melanie Jones, principal Shawn Wells and former Special Education Program Supervisor Doris Kwok. – Defendant's MSJ p 13. 3-6 |
| Nov 13, 2015 | Meeting: Ms. Jelin, Union Rep Ann Katzburg, Director of Certificated Personnel Melanie Jones (Utler), Principal Shawn Wells and former Special Education Program Supervisor Doris Kwok. – Defendant's MSJ p 2. 21-24 |
| Nov 13, 2015 | Meeting: Ms. Jelin was informed that she would be placed on workers' compensation leave of absence as there was a concern that she could not safely perform her job and responsibilities with her injury. – Jones Utler MSJ p 2. 1-3 |
| Nov 13, 2015 | Ms. Jelin believes that the retaliatory acts were motivated by the submission of the EEOC charge because on November 13, 2015 (the date she was placed on leave), she called the EEOC where a representative allegedly stated, "this doesn't surprise me". – Defendant's MSJ p 7. 28; p 8. 1-2 |
| November 2015 | Melanie Jones stated the accommodations were not in place and caused the November 2015 injury. The district could not accommodate so "you have to leave". – Jelin Depo p 8. 23-24 |
| December 2015 | Ms. Jones stated that Ms. Jelin was too disabled and too immobile to work and should retire. – Jelin Depo p 8. 25-26 |
| 01/02-01/06/16 | $721.79 Ed Code Benefits – Personnel/Payroll records |

| | |
|---|---|
| January 17, 2016 | Ms. Jelin claims that she was retaliated against for filing the January 17, 2016 EEOC Charge by not being allowed to return to work, by not being allowed to use her ergonomic set-up from Bob's Foam (an outside vendor), and by assigning her to two schools with the most difficult administrators. – Defendant's MSJ p 7. 25-28 |
| January 27, 2016 | Ms. Jelin filed a Charge of Discrimination with the EEOC – year prior is January 27, 2015. Every alleged act of disability discrimination, failure to engage in the interactive process, failure to provide reasonable accommodation, and retaliation that occurred prior to January 27, 2015 is barred by the statute of limitations. – Defendant's MSJ p 11. 8-12 |
| January 27, 2016 | EEOC Charge of Discrimination filed. – Complaint p 2. 14 |
| January 27, 2016 | Ms. Jelin filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC). – Defendant's MSJ p 2. 13-14 |
| February 2016 | Dr. Devor AME Letter 12/14/16: "she underwent arthroscopic right hip surgery." – Barbara Jelin Declaration Exhibits |
| February 12, 2016 | Dr. Schwartz Work / Activity Status: "Patient may return to full duty/activities with no restrictions on: February 15, 2016." – Personnel/Payroll records |
| March 2, 2016 | Interactive Meeting: Jelin, Morrison, Rogenski, Jones – SRVUSD Letter |
| March 11, 2016 | Government claim form filed. – Complaint p 2. 15 |
| March 14, 2016 | SRVUSD Letter Summarizing 03/02/16 Interactive Meeting |
| After 03/11/2016 | Ms. Jelin claims she was retaliated against for filing the March 11, 2016 Govt. Code §910 form. – Defendant's MSJ p 6. 28; p 7. 1 |
| Spring 2016 | Ms. Jelin believes the District assigned her a heavy workload base on conversations when had with her colleague Amy Scott, who was assigned to assist her in the 2015-2016 school year. – Defendant's MSJ p 3. 20-22 |
| May 26, 2016 | Dr. Schwartz Work/Activity Status: "patient will need to remain off work from 06/09/16 to 06/12/16 for post-operative recovery and rehabilitation. – Personnel/Payroll records |
| June 13, 2016 | Ms. Jelin claims that she was retaliated against for informing the school board that she was directed not to provide mandated services. – Defendant's MSJ p 7. 11-12 |
| June 2016 | Ms. Jelin claims that the District reprimanded her because she was speaking up for the students. She admits that no one stated she was being reprimanded for raising the mandated services issue as the mandated services issue was not discussed during the reprimand. She was reprimanded for an inappropriate comment she made towards a colleague. – Defendant's MSJ p 6. 22-26 |
| June 12, 2016 | Dr. Devor AME Letter 12/14/16: "Ms. Jelin underwent right carpal tunnel surgery. Postoperatively she had physical therapy. – Barbara Jelin Declaration Exhibits |

| | |
|---|---|
| June 14, 2016 | Injury: Dr. Lin Disability Certification / Work Status – Personnel/Payroll records |
| June 2016 | Dr. Devor AME Letter 12/14/16: "Ms. Jelin sustained another new injury. She had just had right carpal tunnel surgery done four days earlier. She was trying to go out the back door of the office at work. .. She does not know what happened, but she ended up hitting her head on the door." – Barbara Jelin Declaration Exhibits |
| June 2016 | Injury – Concussion/whiplash. – Jelin Depo p 2. 18 |
| August 1, 2016 | Ms. Jelin received a right-to-sue letter. – Defendant's MSJ p 2. 15-16 |
| August 1, 2016 | US DOJ Civil Rights Division: Notice of Right to Sue Within 90 Days – to Ms. Jelin: "If you choose to commence a civil action, which suit must be filed in the appropriate Court with 90 days of your receipt of this Notice. – Barbara Jelin Declaration Exhibits |
| August 4, 2016 | Email from Melanie Jones to Barbara Jelin: "I would like to request an interactive meeting in regard to you [sic] most recent work status…" |
| September 2016 | Laurel state to not use the Ideapad, programs were not compatible and login was not appropriate. – Jelin Depo p 12. 26-27 |
| Sept 14, 2016 | Marilyn Verducci email to Angelina Silva "Could you please confirm that the district is still accommodating Barbara Jelin's restrictions? … last seen by PTP, Dr. Lin, 9/7/16, continues on modified duty with the following restriction: keyboarding limited to 5 min/hr, no lifting more than 1 lbs right hand. Next appointments: 9/28/16 & 10/10/16." – Personnel/Payroll records |
| October 4, 2016 | Marilyn Verducci email to Angelina Silva "Barbara Jelin was last seen 9/28/16, continues on modified duty with the same restrictions: keyboarding limited to 5 min/hr, no lifting more than 1 lbs right hand. Next appointments: 10/18/16 & 10/26/16. Could you please confirm Barbara's current work status; is the district still willing to accommodate her ongoing restrictions…. " – Personnel/Payroll Records |
| Dec 14, 2016 | Dr. Devor AME, Letter to Jeffrey Nurik, Esq and Sharon Kelly, Esq: "Ms. Jelin was examined in my Lafayette office. – Barbara Jelin Declaration Exhibits |
| Dec. 20, 2016 | Ideapad was taken. – Jelin Depo p 12. 27 |
| Dec 21, 2016 | Dr. Lin letter to Ms. Jelin – Work Status: "The patient will remain temporarily partially disabled at modified work with limitation of no lifting or pushing more than 5 pounds and to avoid repetitive use of both hands … The patient can lift up to 10 pounds with both forearms. It is okay to use voice dictation system to help her at work. I will see Ms. Jelin again in follow-up in month. – Personnel/Payroll Records |
| January 2017 | Ideapad was returned – it was not set up with compatible programs. – Jelin Depo p 12. 28 |

| | |
|---|---|
| Feb 07, 2017 | CCC Schools Insurance Group Letter to Angelina Silva Re: Permanent Modified or Alternative Employment Search "We are in receipt of medical information from Dr. John Devor, AME report dated 12/14/16 that indicates that Barbara Jelin is medically eligible for vocational rehabilitation benefits through his/her workers' compensation claim. The disability is described as follows:<br>• Ms. Jelin should be restricted from very heavy work to minimize problems with her neck.<br>• She requires no work restrictions for her elbows, hands and wrists.<br>• For the left cubital tunnel syndrome, she needs to be restricted from work that requires repetitive flexion of the left arm at the elbow beyond 90 degrees or work that requires her to rest her left elbow on some surface.<br>• If Ms. Jelin [sic] work station has not been ergonomically evaluated within the past year, it needs to be re-evaluated. … ergo evaluation on an annual basis. … provided with a Sit/Stand workstation. … continue to require the use of voice activated software. – Personnel/Payroll Records |
| 2017 | Ms. Jelin claims she was not assigned a heavy workload. – Defendant's MSJ p 3. 8-9 |
| April 24, 2017 | Dr. Lin Disability Certificate / Work Status: "Bilateral upper extremities and right hip + left knee injury. Temporary Total Disabled from 04/24/17 to 05/24/17." – Personnel/Payroll Records |
| May 09, 2017 | Dr. Lin Disability Certificate / Work Status: "Bilateral wrist injury. Temporary Partial Disabled from 05/11/17 to 06/11/17. No Lifting, Pushing or Pulling over 5 lbs bilateral hands. Right Hand grasping: never. Avoid Repetitive Motion of Right Hands. Keyboarding limited to 5 min per hour. Capable of lifting up to 10 lbs with bilateral forearm. Voice dictation okay." – Personnel/Payroll Records |
| August 02, 2107 | Dr. Lin Disability Certificate / Work Status: "Bilateral upper extremities and right hip + left knee injury. Temporary Partial Disabled from 08/02/17 to 08/16/17. … Keyboarding limited 5 mins per hour. Voice dictation at patients own will after no longer tolerating the typing restrictions of 5 mins per hour. Capable of lifting up to 10 lbs with bilateral forearms." – Personnel/Payroll Records |
| January 05, 2018 | Dr. Lin Disability Certificate / Work Status: "Temporary Partial Disabled from 01/05/18 to 02/05/18." – Personnel/Payroll records |
| January 08, 208 | Dr. Lin Disability Certificate / Work Status: Temporary Partial Disabled from 01/08/18 to 02/08/18." – Personnel/Payroll records |
| May 2, 2018 | Dr. Lin Disability Certificate / Work Status: "DOI – 06/14/16. Temporary Partial Disabled from 05/02/18 to 06/02/18. No lifting, Pushing or Pulling over 10 lbs. Right Hand Grasping, Manipulation – Occasional. Pt to work on a 15"or bigger computer screen to work without causing pain on her upper extremities. * Access to thick |

| | |
|---|---|
| | writing utensils or handwriting of any length." – Personnel/Payroll records |
| Feb 7, 2018 | Dr. Lin Disability Certificate / Work Status: "Temporary Partial Disabled from 02/07/18 to 03/07/18" – Personnel/Payroll records |

*Jelin v. San Ramon Valley Unified School District*

**PROOF OF SERVICE**

I am a citizen of the United States. My business address is 2300 Contra Costa Boulevard, Suite 450, Pleasant Hill, CA 94523. I am employed in the County of Contra Costa where this service occurs. I am over the age of 18 years and not a party to the within cause. I am readily familiar with my employer's normal business practice for collection and processing of correspondence for mailing with the U.S. Postal Service and that practice is that correspondence is deposited with the U.S. Postal Service the same day as the day of collection in the ordinary course of business.

On July 16, 2018, following ordinary business practice, I served the attached document(s) described as

**DEFENDANT SAN RAMON VALLEY UNIFIED SCHOOL DISTRICT'S DISCLOSURE OF EXPERT WITNESS, EXPERT WITNESS INFORMATION AND EXPERT WITNESS REPORT**

**DEFENDANT SAN RAMON VALLEY UNIFIED SCHOOL DISTRICT'S EXPERT WITNESS DECLARATION**

on the interested parties in said action addressed as follows:

Richard M. Rogers, Esq.
Law Office of Richard M. Rogers
100 Bush Street, Suite 1980
San Francisco, CA 94104

**(BY FACSIMILE)** by transmitting via facsimile the document(s) listed above to the facsimile number(s) set forth above, or as stated on the attached service list, on this date before 5:00 p.m.

X **(BY MAIL)** by placing a true and correct copy of the document(s) listed above enclosed in sealed envelope(s) with postage fully prepaid in the U.S. Mail at Pleasant Hill, California.

X **(E-MAIL)** I caused such document(s), to be served on the above-named parties to this action via e-mail. The transmission was reported as complete and without error.

**(BY PERSONAL SERVICE)** by placing a true and correct copy of the document(s) listed above in sealed envelope(s) and causing said envelope(s) to be delivered by hand this date to the offices of the addressee(s).

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on July 16, 2018, at Pleasant Hill, California.

Margaret Dominguez