KEITH R. SCHIRMER, Esq. (087691)
JAMES HUAN LY, Esq. (289912)
EDRINGTON, SCHIRMER & MURPHY LLP
2300 Contra Costa Boulevard, Suite 450
Pleasant Hill, CA  94523-3936
Telephone: (925) 827-3300
Facsimile: (925) 827-3320

Attorneys for Defendant SAN RAMON VALLEY UNIFIED SCHOOL DISTRICT

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BARBARA JELIN,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>SAN RAMON VALLEY UNIFIED SCHOOL DISTRICT,<br><br>　　　　Defendant. | CASE NO.:  C16-5986 EDL<br><br>**DECLARATION OF JAMES HUAN LY IN SUPPORT OF DEFENDANT'S MOTION IN LIMINE No. 2 – LIMITING TESTIMONY OF PLAINTIFF'S EXPERT WITNESS TO ONLY OPINION FOUND IN REPORT**<br><br>Pretrial Conf. October 30, 2018<br>Time:　　　　2:00 p.m.<br>Location:　　Courtroom E, 15th Floor |

I, James Huan Ly, declare:

1. I am an attorney licensed to practice law before all courts the state of California and am one of the attorneys of record for defendant San Ramon Valley Unified School District. I have personal knowledge of the matter set forth herein and if called as a witness, I could and would competently testify thereto. As to the matters stated upon information and belief, I believe them to be true.

2. Attached hereto as Exhibit A is true and accurate excerpts of the Deposition of Ray Grott.

3. Mr. Grott did not prepare an "opposition report" in response to the report of Rhoma Young, the District's expert witness regarding the interactive process and reasonable accommodation. Mr. Grott prepared his initial report in January 2018. Ms. Young prepared a report in June 2018. Mr. Grott did not prepare an opposition report after Ms. Young issued her report in June 2018.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct, is within my personal knowledge, and if called as a witness, I am competent to testify thereto.

Executed on October 10, 2018 at Pleasant Hill, CA.

/s/ J.M.
James Huan Ly

# EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

--oOo--

BARBARA JELIN,

       Plaintiff,                No. C16-5986 EDL

  vs.

SAN RAMON VALLEY UNIFIED
SCHOOL DISTRICT

       Defendant.        /
----------------------------------------

DEPOSITION OF

RAY GROTT, MA, ATP, RET

Tuesday, August 14, 2018


BARLEY & ASSOCIATES
Certified Shorthand Reporters
2977 Ygnacio Valley Road, Suite 123
Walnut Creek, California 94598
(925) 934-8884
BarleyAndAssociates@comcast.net


REPORTED BY: CHRISTINE BEDARD, CSR #10709

                                                                38
1  A.  No, I think that's my note that that's the model
2  of the keyboard.  She has a motorized desk that --
3  motorized meaning height-adjustable desk, that we
4  determined would be best if it was set to 33.5 inches
5  high when standing.
6         She has created a fixed negative angle for the
7  keyboard using a foam wedge.  We initially settled on a
8  Kensington Expert Miles Trackball on a custom wedge that
9  raised the front edge up two inches, but then later
10 revisited that and went with a Cirque, C-i-r-q-u-e, track
11 pad raised up two inches in the front and
12 inch-and-a-quarter in the back on a piece of foam.
13 Q.  Can I interrupt you.  I understand that your
14 report covers most of this stuff.
15 A.  Yeah.
16 Q.  Is there anything in those handwritten notes,
17 Exhibit B, that talk about medical information, Ms. Jelin
18 gave you about her medical issues?
19      MR. ROGERS:  Other than what he's already said?
20      MR. SCHIRMER:  Q.  Other than -- other than --
21 yup --
22 A.  Right.
23 Q.  -- what you've already said Exhibit B contains,
24 which I didn't hear medical information.
25 A.  Right.  Yeah.  The only thing is what I said about

                                                                39
1  her index and pinky going numb.
2  Q.  I heard that.
3  A.  And the rest is all about desks and monitor risers
4  and items that are in my report.
5  Q.  I got that.  So is there anything else on
6  Exhibit B that talks about Ms. Jelin's --
7  A.  No.
8  Q.  -- medical condition?
9  A.  No, there isn't.
10 Q.  Do you have any other sources of information that
11 talk about Ms. Jelin's medical condition?
12 A.  The only other document I have is one that I made
13 summarizing -- some notes I went -- I brought with me
14 from some of the e-mails, just another document I had
15 that you asked for, but it does not talk about her
16 medical condition.
17 Q.  Okay.  That's my question.  Do you have any other
18 documents, information provided you to you in any form
19 that gives you any information about Ms. Jelin's medical
20 condition?
21 A.  No.
22 Q.  What is your understanding of Ms. Jelin's medical
23 condition for which you've consulted her -- with her?
24 A.  She -- my understanding is that she has a
25 significant level of repetitive-strain injury

                                                                40
1  bilaterally, and she indicated that she had surgery on
2  her wrist, but that that was not able -- given the length
3  of time she had that problem, it -- the nerve damage that
4  she encountered was likely to be permanent.
5         I think she also had elbow surgery, both wrist
6  and elbow surgeries, and that trying to do any types of
7  fine-motor activity, such as typing, just maintained and
8  exacerbated chronic pain.
9         She had some back issues that -- and preferred
10 standing and needed to alternate between some type of
11 sitting and standing, mostly kind of perching rather than
12 sitting.  But the main thing was just persistent and
13 chronic pain when she tried to use the -- her hands.
14 Q.  You ever review medical records of people for whom
15 you're giving assessments to obtain an understanding of
16 the specifics of the medical issues?
17 A.  I have.
18 Q.  Is there a reason you didn't ask for any medical
19 records in this case?
20 A.  I was not asked -- I was essentially asked to
21 provide assistance with speech-recognition technology and
22 ergonomic assessments.  Generally, I find that the
23 medical records can be imprecise when it comes to what
24 somebody's actually able to do or can do.
25        The doctors are not usually seeing the person

                                                                41
1  in their environment, and so I rely pretty heavily on
2  what the -- the basic diagnosis, but what I find -- what
3  the client represents.
4  Q.  Okay.  And fair statement to say that, in this
5  case, you've relied exclusively on what Ms. Jelin has
6  told you about her medical situation for purposes of your
7  work?
8  A.  Yes.
9  Q.  Now, earlier you said you understand she has a
10 significant level of RSI bilaterally.  RSI is
11 repetitive-strain injury?
12 A.  Correct.
13 Q.  Bilaterally is both arms?
14 A.  Yes.
15 Q.  And significant level of RSI.  What do you mean by
16 a significant level?
17 A.  In my experience doing Workers'-Comp-related
18 assessments, there's minor aches and pains, periodic
19 pains, go home at night and find that your arms or hands
20 or neck are sore versus what I call chronic pain and a
21 real inability to do the standard tasks, manual or --
22 manual or physical tasks that people are expected to do.
23 Q.  Okay.  So your terminology is significant level of
24 RSI bilaterally?
25 A.  Yeah.

54

1 not there to look at that part of her job. I was looking
2 at her record-keeping and report generation and send
3 e-mail communications and similar duties. Basically
4 whatever was requiring computer access.
5    Q. How long has, if you know, Ms. Jelin been
6 performing the essential functions as her job as a
7 psychologist for the District?
8    A. I do not know.
9    Q. Do you know if she's worked there one year,
10 five years, ten years?
11    A. My sense is that it's been over five years.
12    Q. So the issues you addressed with Ms. Jelin as
13 you're meetings with her, do you know for what period of
14 time those issues had been in existence?
15    A. I recall a presentation by her that these have
16 been problems that have involved and existed for a long
17 time, and that she's been trying to get resolved for a
18 long time. I didn't take notes about the actual lengths
19 of time.
20    Q. Do you know for what years the issues presented by
21 Ms. Jelin in your consulting with her have occurred?
22    A. I do not.
23    Q. When you came to the school to meet with Ms. Jelin
24 for the first time, were you ever told by Ms. Jelin that
25 you could not come to the school or that your services

55

1 were refused?
2    A. Part of our initial communication was an
3 expression of frustration that she had tried to secure my
4 services but was told that the District had to use its
5 ergonomic consultants and that served to delay some
6 getting the expertise she needed. I believe that is
7 reflected in the e-mails which I've submitted.
8    Q. Who gave you that information that you just
9 related?
10    A. Ms. Jelin.
11    Q. Ms. Jelin?
12    A. Yes.
13    Q. All right. The essential functions of Ms. Jelin's
14 job in meeting students and providing services as school
15 psychologist, has Ms. Jelin been able to provide those
16 essential functions of the job for the period of time
17 she's held employment at San Ramon Valley Unified School
18 District?
19    A. All I know is that she's been -- that she
20 represented to me that she was having an increasingly
21 difficult time doing that because of her difficulty with
22 the record-keeping and using the tools and forms and
23 software that was being required of her.
24    Q. Okay. Do you have any information that Ms. Jelin
25 has not performed the essential functions of her job at

56

1 any period of time in doing her work at the district?
2    A. That has -- that information has not been shared
3 with me, and so -- beyond what she represented, Ms. Jelin
4 represented to me.
5    Q. So you don't have any specific information --
6    A. Correct.
7    Q. -- about that, correct?
8    A. Correct.
9    Q. All right. Let's turn to the report. I know that
10 you address several things when you met with her. You
11 start off in your report with indicating she's a school
12 psychologist at Live Oak and Tassajara Hills in
13 San Ramon.
14       She has significant upper-extremity RSI
15 issues. We already talked about your understanding of
16 that, as well as a need to alternate between sitting and
17 standing. I met with her to review her current set-ups
18 and make recommendations for possible improvements.
19 All right.
20       One other thing about the RSI, the
21 repetitive-strain issues, did you do any testing of
22 Ms. Jelin to determine the nature and extent of any
23 limitations from the repetitive strain?
24    A. I'm not a medical professional, so I did not do
25 any testing.

57

1    Q. Okay. You said, I believe you used the
2 terminology or Ms. Jelin did, that they -- they're
3 significant. She used those words -- I believe you
4 stated she used those words in describing the
5 repetitive-strain injury issues she has.
6       Did you do anything on your own, in terms of
7 evaluation, to assess the severity of the
8 repetitive-strain issues or the limitations posed by the
9 RSI issues?
10    A. I did -- no, other than noting that there were
11 times when I was having her try keyboards and stuff that
12 she complained about her hands hurting.
13    Q. With your work with the State Rehabilitation
14 Department --
15    A. Department of Rehabilitation.
16    Q. Department of Rehabilitation, you ever meet with
17 people in an office setting and do actual functional
18 tests to determine the nature and extent of any
19 limitations?
20    A. I do not. That is sometimes done by other
21 consultants prior to my coming in.
22    Q. Okay. Do you ever do any functional testing as
23 part of the work you provide?
24    A. No, I do not.
25    Q. In order -- would it be fair then to say that in

**142**

1  A.  If I am asked about them.
2  Q.  Well, of course.  Are there opinions outside the
3 four corners of this two-page report that you intend to
4 offer at time of trial?
5  A.  No, because -- yeah.  There's no knowledge I have
6 beyond what we've discussed, other than what would be
7 speculation.
8     MR. SCHIRMER:  Okay.  Let me take a few minutes.
9 This might be an appropriate break for everybody.  Let me
10 flip through my notes.
11     MR. ROGERS:  I have something to cover.  Can I do
12 that now or should I wait?
13     MR. SCHIRMER:  I'd like to take notes while you're
14 doing that.  Let's take a break.
15     MR. ROGERS:  I didn't mean to do it while you were
16 out of the room.
17           (Brief recess taken.)
18     MR. SCHIRMER:  Q.  Sir, do you have any information
19 or any information that the District ever failed to
20 participate in good faith to undertake reasonable efforts
21 to communicate with Ms. Jelin regarding her concerns?
22  A.  No.
23  Q.  Do you have any information if there was ever a
24 breakdown in communications between Ms. Jelin and the
25 District in discussing reasonable accommodations for

**143**

1 Ms. Jelin?
2  A.  No.
3  Q.  Was Ms. Jelin -- strike that.  Would you agree
4 that the District made ongoing efforts to work with
5 Ms. Jelin on the repetitive-strain issues she presented?
6  A.  What do you mean by "ongoing"?
7  Q.  Over time as the issues were presented, they
8 worked with her on that?
9  A.  From the date -- I can affirm that is true from
10 the date that I became involved.
11  Q.  Okay.  And you don't have information prior to
12 that date about that; is that correct?
13  A.  No direct information, just what was told to me.
14  Q.  The District's efforts to work with Ms. Jelin
15 resulted in solutions to some of the RSI issues she
16 presented, correct?
17  A.  I can't attest to that because --
18  Q.  You don't know.
19  A.  I would say some attempts were made, but I don't
20 think that they have resolved the situation, from what
21 I'm aware of.
22  Q.  So some of the issues presented by Ms. Jelin did
23 not get completely resolved --
24  A.  Correct.
25  Q.  -- by the District's efforts, correct?

**144**

1  A.  Correct.
2  Q.  Okay.  Is it reasonable to expect, in working on
3 finding accommodations for a person in the workplace,
4 that challenges will be generally encountered in doing
5 so?
6  A.  Yes, depending on the complexity of the situation.
7  Q.  Okay.  And do you have a opinion as to the
8 complexity of Ms. Jelin's situation?
9  A.  I do.  I think her hand problems present complex
10 challenges, and that is highly compounded by her need to
11 use Google Docs.
12  Q.  So is it reasonable to expect frustrations in
13 working with a person to find accommodations that meet
14 these challenges when it's a situation where the
15 challenges are as complex as Ms. Jelin's?
16  A.  I will say frustration is -- is possible, but not
17 a reason on anybody's part to not try to find the best
18 solution and the best resources.
19  Q.  So it reasonable to expect some frustrations from
20 Ms. Jelin during this process?
21  A.  If -- yes, if -- if efforts weren't made in a
22 timely way.
23  Q.  Is it reasonable to expect some frustration on the
24 District's part as a result of this process?
25  A.  Yes, if adequate resources were not brought into

**145**

1 the picture.
2  Q.  Is it reasonable to expect some frustration on
3 your part, in being part of this process, in working on
4 finding appropriate way to address issues?
5  A.  Yes, that's part of my job, to -- to get beyond
6 that.
7     MR. SCHIRMER:  Okay.  Counsel.
8
9           EXAMINATION BY Mr. Rogers
10     MR. ROGERS:  Thank you.
11  Q.  There's been testimony in this case, when Dragon
12 was first installed, it was installed on a older computer
13 that did not have the capacity that Dragon needed.  They
14 were basically incompatible.  How long would it take you,
15 if brought in, to determine incompatibility?
16  A.  About one minute.
17  Q.  Okay.
18  A.  Unless it was an older version and I would have to
19 research.  My memory only goes, so ...
20  Q.  Let's make it less than -- let's make it somebody
21 who is a competent I.T. person.  How long would it take
22 them to discover the hardware and the software were
23 incompatible?
24  A.  It shouldn't take long, because that minimum and
25 recommended specifications are available on Nuance's

Jelin v. San Ramon Valley USD U.S.D.C. No. C16-05986 EDL

## PROOF OF SERVICE

I am a citizen of the United States. My business address is 2300 Contra Costa Boulevard, Suite 450, Pleasant Hill, CA 94523. I am employed in the County of Contra Costa where this service occurs. I am over the age of 18 years and not a party to the within cause. I am readily familiar with my employer's normal business practice for collection and processing of correspondence for mailing with the U.S. Postal Service and that practice is that correspondence is deposited with the U.S. Postal Service the same day as the day of collection in the ordinary course of business.

On October 10, 2018, following ordinary business practice, I served the attached document(s) described below on the interested parties in said action addressed as follows:

**DECLARATION OF JAMES HUAN LY IN SUPPORT OF DEFENDANT'S MOTION IN LIMINE NO. 2 – LIMITING TESTIMONY OF PLAINTIFF'S EXPERT WITNESSES TO ONLY OPINION FOUND IN REPORT**

Richard Rogers
Law Offices of Richard Rogers
100 Bush Street, #1980
San Francisco, CA 94104
Tel: 415-981-9788
Fax: 415-981-9798
RogersRMR@yahoo.com
Attorneys for Plaintiff

      **(BY FACSIMILE)** by transmitting via facsimile the document(s) listed above to the facsimile number(s) set forth above, or as stated on the attached service list, on this date before 5:00 p.m.

      **(BY MAIL)** by placing a true and correct copy of the document(s) listed above enclosed in sealed envelope(s) with postage fully prepaid in the U.S. Mail at Pleasant Hill, California.

      **(BY PERSONAL SERVICE)** by placing a true and correct copy of the document(s) listed above in sealed envelope(s) and causing said envelope(s) to be delivered by hand this date to the offices of the addressee(s).

      **(BY E-MAIL)**

**X**      **(BY OVERNIGHT DELIVERY)** by placing a true and correct copy of the document(s) in a sealed envelope(s) and causing said envelope(s) to be delivered to an overnight delivery carrier with delivery fees provided for, addressed to the person(s) on whom it is to be served.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on October 10, 2018, at Pleasant Hill, California.



Dana Moxley

1